# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP2665 |
| COMPLETE TITLE: | In re the commitment of Anthony Jones: |

State of Wisconsin,
        Petitioner-Respondent,
    v.
Anthony Jones,
        Respondent-Appellant-Petitioner.

REVIEW OF DECISION OF THE COURT OF APPEALS
(no cite)

| | |
|---|---|
| OPINION FILED: | May 4, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 21, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Rhonda L. Lanford |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | R.G. BRADLEY, J., concurs, joined by ABRAHAMSON, J., and KELLY, J. (opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by and an oral argument by *Andrew R. Hinkel*, assistant state public defender.

For the petitioner-respondent, there was a brief filed by *Amy C. Miller*, assistant solicitor general, with whom on the brief were *Brad D. Schimel*, Attorney General, and *Misha Tseytlin*, solicitor general. There was an oral argument by *Amy C. Miller*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP2665
(L.C. No. 2013CI4)

STATE OF WISCONSIN        :       IN SUPREME COURT

In re the commitment of Anthony Jones:

State of Wisconsin,

      Petitioner-Respondent,

  v.

Anthony Jones,

      Respondent-Appellant-Petitioner.

**FILED**

**MAY 4, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished, unauthored summary affirmance of the court of appeals, State v. Jones, No. 2015AP2665, unpublished order (Wis. Ct. App. Apr. 10, 2017), affirming the Dane County circuit court's[1] judgment finding Anthony Jones ("Jones") to be a

---

[1] The Honorable Rhonda L. Lanford presided.

"sexually violent person" under Wis. Stat. § 980.02(1)(a) (2015-16).[2]

¶2 On November 29, 1993, Jones was convicted of three counts of second-degree sexual assault, use of force, under Wis. Stat. § 940.225(2)(a), and was scheduled to be released from custody on August 15, 2013. On August 9, 2013, the State filed a petition to commit Jones as a sexually violent person, pursuant to Wis. Stat. ch. 980. Prior to the commitment trial, Jones filed a motion in limine to exclude testimony pertaining to the Minnesota Sex Offender Screening Tool-Revised ("MnSOST-R") and the Rapid Risk Assessment for Sexual Offense Recidivism ("RRASOR"),[3] which are actuarial instruments designed to measure an offender's risk of reoffending. He argued that testimony as to the results produced by these instruments was not admissible under Wis. Stat. § 907.02 because it was not based on sufficient facts or data, was not the product of reliable principles and methods, and was not reliably applied to the facts of his case. The circuit court denied the motion, finding that such testimony was admissible. After a four-day trial, the jury found that Jones was "a sexually violent person, as alleged in the petition." Jones appealed.

---

[2] All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

[3] Jones also sought to exclude testimony pertaining to the Static Risk Assessment 99 ("Static-99"), but he does not renew his challenge to that testimony here.

¶3   The court of appeals affirmed.  It held that the circuit court had not erroneously exercised its discretion in admitting the testimony because the circuit court applied the proper standard and found that the instruments were the product of sufficient facts or data, that the instruments were the product of reliable principles and methods, and that the instruments had been the subject of extensive review.  The court of appeals further noted that Jones' arguments went to weight, not admissibility, and that, therefore, he had had the opportunity to discredit the testimony through cross-examination.  Jones petitioned for review.

¶4   We consider one issue on review:  whether the circuit court erroneously exercised its discretion under Wis. Stat. § 907.02(1) when it admitted expert testimony based on the results of the MnSOST-R and the RRASOR tests.  We conclude that the circuit court did not erroneously exercise its discretion because it evaluated the relevant facts under the proper standard and articulated a reasonable basis for its decision.

¶5   Thus, we affirm the decision of the court of appeals.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Statutory History

¶6   The admissibility of expert testimony is governed by Wis. Stat. § 907.02.  Prior to 2011, § 907.02 read as follows:

Testimony by experts.  If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education,

3

may testify thereto in the form of an opinion or otherwise.

Wis. Stat. § 907.02 (2009-10).   This was a liberal standard. Under this prior standard

> "questions of the weight and reliability of relevant evidence [were] matters for the trier of fact." State v. Fischer, 2010 WI 6, ¶7, 322 Wis. 2d 265, 778 N.W.2d 629.   "[E]xpert testimony [was] generally admissible in the circuit court's discretion if the witness [was] qualified to testify and the testimony would help the trier of fact understand the evidence or determine a fact at issue." State v. Kandutsch, 2011 WI 78, ¶26, 336 Wis. 2d 478, 799 N.W.2d 865.

Seifert v. Balink, 2017 WI 2, ¶174, 372 Wis. 2d 525, 888 N.W.2d 816 (Ziegler, J., concurring) (alterations in original). "This was a 'low threshold.'" Id. (citations omitted).

¶7   In 2011, the legislature amended the statute,[4] which now reads as follows:

> Testimony by experts. (1) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

> (2) Notwithstanding sub. (1), the testimony of an expert witness may not be admitted if the expert witness is entitled to receive any compensation contingent on the outcome of any claim or case with respect to which the testimony is being offered.

---

[4] See 2011 Wis. Act 2, §§ 34m, 37.

Wis. Stat. § 907.02.  These changes adopted the federal standard, which incorporates the analysis promulgated in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  <u>See</u> <u>Seifert</u>, 372 Wis. 2d 525, ¶6.[5]

¶8  In <u>Daubert</u>, the United States Supreme Court concluded that Federal Rule of Evidence 702 imposed two requirements for the admission of expert testimony:  (1) that "[t]he subject of an expert's testimony must be 'scientific . . . knowledge'"; and (2) that "the evidence or testimony [must] assist the trier of fact to understand the evidence or to determine a fact in issue."  <u>Daubert</u>, 509 U.S. at 589-91.  In determining whether expert testimony meets this standard, the Court set forth a nonexclusive list of questions courts should consider when making these determinations:

- whether the evidence can be (and has been) tested;
- whether the theory or technique has been subjected to peer review and publication;
- the known or potential rate of error;
- the existence and maintenance of standards controlling the technique's operation; and

---

[5] Although there was no majority opinion in <u>Seifert v. Balink</u>, 2017 WI 2, 372 Wis. 2d 525, 888 N.W.2d 816, a majority of the court agreed that the amendment of Wis. Stat. § 907.02 adopted the federal <u>Daubert</u> standard.  <u>See</u> <u>Seifert</u>, 372 Wis. 2d 525, ¶6 (lead opinion); <u>id.</u>, ¶169 (Ziegler, J., concurring); <u>id.</u>, ¶¶193, 257 (Gableman, J., concurring, joined by Roggensack, C.J.); <u>id.</u>, ¶¶263 n.3, 296 (Kelly, J., dissenting, joined by R. Grassl Bradley, J.).

- the degree of acceptance within the relevant scientific community.

Id. at 593-94. The Court later held that Daubert's general principles were not limited to "scientific" knowledge, and that the analysis applies to all expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999).

## B. Factual and Procedural Background

¶9 As noted above, this case arises from Jones' three convictions for second-degree sexual assault on November 29, 1993. Jones was sentenced to 15 years probation for these convictions, but Jones' probation was revoked when he committed another sexual assault. He was then sentenced to 10 years imprisonment and was due to be released on August 15, 2013.

¶10 Just before his release date, on August 9, 2013, the State filed a petition to commit Jones as a "sexually violent person." Wis. Stat. §§ 980.02(1)(a), 980.01(7). The State based its petition on the report of Anthony Jurek, Ph.D., which documented Jones' history of sexual and non-sexual arrests, charges, and convictions, his misconduct as an inmate, his probation violations, and his scores on four actuarial instruments:

- On the RRASOR, Jones scored a 5, which corresponds to a 49.8 percent rate of reconviction for sexual offenses within 5 years and a 55.3 percent rate within 10 years.
- On MnSOST-R, Jones scored an 11, which corresponds to a 30 percent rate of recidivism within 6 years.

6

- On the Static Risk Assessment 99 ("Static-99"), Jones scored a 9, which corresponds to a 39 percent rate of reconviction for sexual offenses over 5 years, a 45 percent rate within 10 years, and a 52 percent rate within 15 years.

- On the Static-99R, Jones scored an 8, which corresponds to a 45 percent rate of re-arrest and reconviction within 5 years, and a 55.3 percent rate within 10 years.

The State alleged that these scores "support [Dr. Jurek's] conclusion that [Jones] is 'more likely than not' to commit a sexually violent offense in the future."

¶11 On August 23, 2013, the circuit court held a probable cause hearing, found "probable cause to believe that [Jones] is a sexually violent person within the meaning of Wis. Stat. § 980.01(7)," and ordered that Jones remain in custody pending the outcome of the commitment proceedings.

## 1. The Daubert hearing

¶12 On June 17, 2014, Jones filed a motion to bar testimony pursuant to Wis. Stat. § 907.02. In general, he argued that expert testimony regarding any results of the MnSOST-R, the RRASOR, and the Static-99 should be excluded because they are not based on sufficient facts or data, they are not the product of reliable principles and methods, and they were not applied reliably to the facts of Jones' case. "Specifically, [Jones argued that] all three actuarial risk instruments have obsolete norms and fail to adequately take into

7

account the correlation between age and recidivism risk." He argued that the MnSOST-R is particularly flawed because it has not been published in an academic journal, was developed using inadequately small and unrepresentative samples (256 offenders), and excludes offenders known to have lower recidivism rates. Similarly, Jones argued that the RRASOR has not been published in an academic journal, was developed using inadequately small and unrepresentative samples (2,592 offenders), and its 10-year reconviction rate is just a factor of the 5-year reconviction rate, that is, it is not based on empirical data.

¶13 On August 20, 2014, the State filed its response. It noted that Jones did not appear to be challenging the use of actuarial instruments in general, or the qualifications of Dr. Jurek or the State's other expert, Bradley Allen, Ph.D. The State then argued that the MnSOST-R, RRASOR, and Static-99

> have all been carefully researched, widely discussed and dissected in the professional literature. They are the product of sophisticated, but hardly novel, statistical techniques for the analysis of large amounts of data. Experts may disagree on the application, scoring, interpretation and weight to be given to the various actuarial instruments . . . but that is a different matter than claiming that the instruments themselves are not the product of reliable data, and principles.

In this regard, the State observed that all of the experts——Jones' included——rely on substantially the same risk assessment methodology, but give weight to different factors during that process. It argued that "these differences are not a matter of admissibility," but rather that they are matters "best resolved

through cross-examination and the presentation of contrary evidence."

¶14 On August 25 and 26, 2014, the circuit court held a hearing on the motion. At the hearing, Dr. Jurek and Dr. Allen testified for the State, and Richard Wollert, Ph.D., testified for Jones.

¶15 Dr. Jurek testified that his evaluations incorporate a review of records from the police, the Department of Corrections, and probation officers, as well as a social history, substance abuse history, sexual history, and treatment history, along with the actuarial assessments. He explained that "an actuarial assessment is the use of particular demographic variables that you can score a particular individual on, and then compare their score to individuals in a sample population who have a known rate of recidivism." He also explained that all of the instruments have limitations, and, at best, have "moderate" predictive accuracy, but that evaluators incorporate the results from these instruments into their reports because "[u]sing the actuarials has been proven to be more accurate." In this regard, Dr. Jurek noted that there is no one best instrument, that every instrument has limitations, and that which instrument to use is a matter of preference and a matter of how evaluators weigh the results in the process of their evaluation. He then testified regarding each of the four actuarial instruments that he used in his evaluation of Jones.

¶16 With regard to the MnSOST-R, Dr. Jurek testified that, although there is no definitive academic paper on the test, 12

9

research inquiries have found it to have a positive relationship to sexual recidivism. He also testified that the MnSOST-3——a more recent instrument published by the creators of the MnSOST-R——is not a replacement because its sample is made up of different kinds of offenders than were included in the sample for the MnSOST-R. In this regard, he was aware of the criticism that the purposeful exclusion of offenders known to be low-risk (intrafamilial and non-contact offenders) resulted in a sample biased to overestimate risk, but testified that selective sampling can be useful if the goal is to homogenize the sample to improve predictive accuracy for a more specific population of people. He was also aware of the criticism that the dichotomous way in which the MnSOST-R accounts for age[6] is inadequate because it fails to account for the observed trend that the risk of recidivism continues to decline in a linear fashion as offenders age, but testified that accounting for age differently does not mean that the test inadequately accounts for age. Ultimately, Dr. Jurek testified that the MnSOST-R is based on sufficient facts and data, and that it is the product of reliable principles and methods.

¶17 With regard to the RRASOR, Dr. Jurek testified that, although the test was not originally published in a peer-reviewed journal, he used it because it has an established

---

[6] In applying the MnSOST-R, evaluators add a point to an offender's score if he or she is less than 30 years old and no points are added or subtracted if he or she is more than 30 years old.

history of use, with approximately 35 studies demonstrating a positive relationship to sexual recidivism. He was aware of the criticism that the sample had not been updated since 1997 (when it was first published), but testified that, even "if the general norms for sexual recidivism[] go down, [if] you're working in a [high-risk] population, the newer norms don't do you any good." He was also aware of the criticism that the 10-year recidivism rates are simply a multiplication factor of the 5-year recidivism rates (i.e., are not based on empirical data), but disagreed that that was actually the case. Additionally, the same criticism raised regarding age against the MnSOST-R was raised against the RRASOR, but, as he had testified regarding the MnSOST-R, Dr. Jurek testified that the dichotomous age[7] metric did not render the instrument ineffective. Ultimately, Dr. Jurek testified that the RRASOR is based on sufficient facts and data, and that it is the product of reliable principles and methods.

¶18 Dr. Allen also testified for the State. He testified primarily with regard to the Static-99 and the Static-99R, which were the instruments he had relied on in conducting his evaluation of Jones. He did, however, testify that he did not use the RRASOR because he believed it to be outdated, but that there was nothing unreliable about the data used to construct

---

[7] In applying the RRASOR, evaluators add a point to an offender's score if he or she is less than 25 years old and no points are added or subtracted if he or she is more than 25 years old.

11

it. Specifically, on the issue of measuring the effect of age on the risk of recidivism, Dr. Allen testified that, "although age [] is definitely a factor to consider, we don't know why." He suggested that it could be because older offenders are underreported, or it could be related to declining health in older offenders. He acknowledged that "[k]nowing why age and recidivism are correlated . . . is not needed to conclude that incorporating age can improve risk assessment measures," but testified that the fact that there is a debate about how to incorporate the age factor does not equate with unreliability or invalidity. Ultimately, he concluded that responsible examiners may responsibly use different actuarial instruments and that it is "somewhat prudent to look at all the different assessments, and all the different factors and consider them for a particular individual."

¶19 Dr. Wollert testified for Jones and testified about all four tests. He prefaced his testimony by noting that he had not himself evaluated Jones; rather, his testimony was based on the evaluations of Drs. Jurek and Allen, and his own expertise, given his approximately 30 years in the field.

¶20 With regard to the MnSOST-R, Dr. Wollert testified that it was not based on sufficient facts and data and was not based on reliable principles and methods because it had not been

peer reviewed,[8] the sample on which it is based is small, biased, and unrepresentative as applied to Jones, and no one has ever analyzed which of the 16 factors the MnSOST-R accounts for are actually related to recidivism. In particular, the biased nature of the sample "virtually guarantees a high false positive rate over estimating the probability of recidivism."

¶21 With regard to the RRASOR, Dr. Wollert testified that it was not based on sufficient facts and data and was not based on reliable principles and methods because its dichotomous means of accounting for age is inadequate, its data set is many years old, and the 10-year rates are simply the 5-year rates multiplied by a factor of 1.5, which is a serious problem because actual empirical data indicates that the farther out you go the less likely offenders are to reoffend.

¶22 Despite these criticisms, Dr. Wollert acknowledged that not all offenders are alike, that different subgroups have different risks, and that the best way to determine the risk of recidivism is to compare the individual to a similar subgroup. Additionally, Dr. Wollert acknowledged that actuarial assessment is a complex task, that there is more than one way to conduct an actuarial assessment, and that all actuarial instruments have

---

[8] Dr. Wollert defined "peer review[ed]" as "a method of judging the merits of a scientific article, and making a determination of whether it meets the standards of a journal." On cross-examination, however, he agreed that there is more than one way to peer review, including that "it can be peer-reviewed if it's given at a, say, conference, but it doesn't have the same weight."

13

limits. In this regard, he agreed with Dr. Jurek that the instruments all report error rates and, at best, have moderate predictive accuracy.

¶23 After hearing brief closing arguments from counsel, the circuit court concluded that testimony as to the results from the MnSOST-R and the RRASOR was admissible. In doing so, it explained the standard it was applying as follows:

> [Wisconsin Stat. § 907.02] was revised in 2011 and tracks federal rule 702 also known as the Daubert standard . . . named after Daubert versus Merrell Dow Pharmaceuticals, 509 U.S. 579, 1993. It is axiomatic. The Court can look to federal cases interpreting [this] rule[.] Because there is a dearth of case law, this Court will look primarily at federal law . . . .

> Judges may admit testimony resting on scientific, technical or otherwise specialized knowledge that will assist the trier of facts. . . . [R]ule 702 states that it does not condition admissibility on the State of the published literature and the complete and flaw free set of data, that a witness is qualified as an expert by knowledge, skill, experience, training, or education, and that expert may testify in the form of an opinion if the testimony is based upon sufficient facts or data. The testimony is principles and methods, and the witness has applied the principles and methods reliably to the facts of the case . . . . Daubert makes clear, [it does] not constitute a definitive checklist or test. Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

The circuit court then concluded that:

> The evidence at the hearing through the witnesses show[s] that all of the tests and the testimony offered were the product of sufficient facts or data and the product of reliable [principles] and methods. . . .

> [W]hile publication in a journal is the most rigorous, it is not the only way to peer review. The witnesses

14

testified that these tests are routinely published []
both in journals and in published papers. . . . All of
the instruments were subject of extensive review.
They have been written about, and even criticized [in]
the papers that [were] submitted.

They have also been used in other cases, in other
jurisdictions, and the Court was not able to find any
cases where these tests were stricken based on
admissibility or based on a Daubert challenge. The
tools have been debated, reviewed, and revised. This
is not junk science, which is what Daubert sought to
reject. These actuarial tools are widely used in
predicting recidivism in sex offenders. . . . Both
Dr. Jurek, and Dr. Allen testified that
they . . . reviewed Mr. Jones' records and all the
information they had and testified that this is the
type of information reasonably relied upon by experts
in their field.

And there was no evidence suggesting or even
challenging that they administered the test
incorrectly or interpreted the actuarial data
incorrectly.

The circuit court additionally noted:

[T]he State proceeds at its own peril if Mr. Jones,
through cross-examination can convince a jury that
Dr. Jurek and Dr. Allen's [testimony] is
antiquated . . . . [But] Mr. Jones' criticisms of the
actuarial tools are only that, criticisms, and cannot
form the basis for this court to exclude this
testimony.

The weight to give this testimony is for the jury
to decide. This is a weight, not an admissibility
analysis. . . . The Court is satisfied that this
testimony presented meets all of the requirements for
admissibility, and Mr. Jones' motion to exclude is
denied.

## 2. Trial and appeal

¶24 On September 29, 2014, Jones' trial for commitment as
a sexually violent person under chapter 980 began. At trial,

15

three experts testified: Dr. Jurek and Dr. Allen testified for the State, and Thomas Zander, Ph.D., testified for Jones. Dr. Jurek was "the only psychologist in this case to have used the RRASOR and [the] MnSOST-R to evaluate Mr. Jones' risk." On October 2, 2014, the jury returned a special verdict finding that Jones was "a sexually violent person, as alleged in the petition." Jones appealed.

¶25 On appeal, Jones challenged his commitment on the basis that the circuit court's admission of testimony based on the MnSOST-R and the RRASOR was reversible error. On April 10, 2017, the court of appeals summarily affirmed. Jones, No. 2015AP2665. The court of appeals held that the circuit court had not erroneously exercised its discretion because it considered the Daubert factors and found that the instruments were the product of sufficient facts and data, that the instruments were the product of reliable principles and methods, and that the instruments had been the subject of extensive review. Id. The court of appeals further noted that Jones' arguments went to weight, not admissibility, and that, therefore, he was able to discredit the testimony through cross-examination. Id. Jones petitioned for review.

¶26 On September 11, 2017, Jones' petition for review was granted.

16

## II.  STANDARD OF REVIEW

¶27  "Questions regarding the admissibility of evidence are within the circuit court's discretion."  Nat'l Auto Truckstops, Inc. v. DOT, 2003 WI 95, ¶12, 263 Wis. 2d 649, 665 N.W.2d 198.

> Where this court is asked to review such rulings, we look not to see if we agree with the circuit court's determination, but rather whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record.   A circuit court properly exercises its discretion when it considers the relevant facts, applies the correct law, and articulates a reasonable basis for its decision.

Id. (citations omitted).  Whether the circuit court applied the correct law, however, requires us to interpret the statute. "The interpretation and application of a statute present questions of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court."  State v. Alger, 2015 WI 3, ¶21, 360 Wis. 2d 193, 858 N.W.2d 346.   Thus, "this court decides whether the circuit court applied the proper legal standard under Wis. Stat. § 907.02(1) . . . independently of the circuit court and the court of appeals but benefiting from their analyses."  Seifert, 372 Wis. 2d 525, ¶89.

## III.  ANALYSIS

¶28  We consider one issue on review:  whether the circuit court erroneously exercised its discretion under Wis. Stat. § 907.02(1) when it admitted expert testimony based on the results of the MnSOST-R and the RRASOR tests.  We conclude that

17

the circuit court did not erroneously exercise its discretion because it evaluated the relevant facts under the proper standard and articulated a reasonable basis for its decision.

¶29 As noted above, the admissibility of expert testimony is governed by the recently amended Wis. Stat. § 907.02, which provides, in relevant part, as follows:

> Testimony by experts. (1) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

Wis. Stat. § 907.02(1). This statute requires that circuit courts make five determinations before admitting expert testimony: (1) whether the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (2) whether the expert is qualified as an expert by knowledge, skill, experience, training, or education; (3) whether the testimony is based upon sufficient facts or data; (4) whether the testimony is the product of reliable principles and methods; and (5) whether the witness has applied the principles and methods reliably to the facts of the case.

¶30 The first two determinations were also required under the pre-amendment statute. And they were all that was required. As noted above, this was an easier standard to satisfy, because,

18

as with relevance generally,[9] the court's role was simply to determine whether the evidence made a fact of consequence more or less probable (although the evidence did also have to be introduced by a qualified witness).  See Seifert, 372 Wis. 2d 525, ¶174 (Ziegler, J., concurring) (quoting State v. Kandutsch, 2011 WI 78, ¶26, 336 Wis. 2d 478, 799 N.W.2d 865) ("'Expert testimony was generally admissible in the circuit court's discretion if the witness was qualified to testify and the testimony would help the trier of fact understand the evidence or determine a fact at issue.'" (Alterations omitted.)).

¶31 The court's role with regard to the admissibility of evidence is often described as that of a gatekeeper.  See, e.g., State v. Fischer, 2010 WI 6, ¶40, 322 Wis. 2d 265, 778 N.W.2d 629 (Ziegler, J., concurring) ("The judge, as gatekeeper, has the capacity to determine whether certain evidence is admissible."); see also State v. Wilson, 2015 WI 48, ¶99, 362 Wis. 2d 193, 864 N.W.2d 52 (Ziegler J., concurring) ("The trial court remains the gatekeeper in determining what evidence is

---

[9] Relevance is governed by Wis. Stat. § 904.01, which states as follows:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Wis. Stat. § 904.01.

admissible and why."). In this role, courts seek to ensure that the evidence submitted to the factfinder is of the requisite quality. The quality standards for admission of evidence vary based on the type of evidence at issue and the purpose for which it is offered. See Wis. Stat. ch. 901. These standards are prescribed by statute and represent the legislature's determination of a balance that ensures "that the truth may be ascertained and proceedings justly determined." Wis. Stat. § 901.02. In this regard, the admissibility of evidence is distinguished from the weight given to evidence that is admissible; the court's role is to admit evidence that meets the prescribed standards, which the factfinder then weighs to ascertain the truth.

¶32 The heightened standard under the amended Wis. Stat. § 907.02 does not change this gatekeeping function. It does, however, require more of the gatekeeper. Instead of simply determining whether the evidence makes a fact of consequence more or less probable, courts must now also make a threshold determination as to whether the evidence is reliable enough to go to the factfinder. The legislature has prescribed that courts do this by looking at whether the testimony is based upon sufficient facts or data, whether the testimony is the product of reliable principles and methods, and whether the witness has applied the principles and methods reliably to the facts of the case. As noted above, these requirements represent Wisconsin's adoption of the federal Daubert standard. See supra ¶7.

20

¶33  In applying this standard, courts typically, although not exclusively, consider

- whether the evidence can be (and has been) tested;
- whether the theory or technique has been subjected to peer review and publication;
- the known or potential rate of error;
- the existence and maintenance of standards controlling the technique's operation; and
- the degree of acceptance within the relevant scientific community.

Daubert, 509 U.S. at 593-94.  Although this is a more burdensome standard, it is not exceedingly high; the court's "role [is to ensure] that the courtroom door remains closed to junk science." Seifert, 372 Wis. 2d 525, ¶85.  Moreover, although more burdensome, "trial courts [still] retain substantial discretion in deciding whether to admit expert testimony."  Id., ¶178 (Ziegler, J., concurring) (citing Kumho, 526 U.S. at 141-42). Thus, as with other admissibility determinations, we will not overturn a circuit court's admission of expert testimony unless the court failed to consider the relevant facts, failed to apply the proper standard, or failed to articulate a reasonable basis for its decision.

¶34  Here, the circuit court considered the relevant facts, applied the proper standard, and articulated a reasonable basis

for its decision.[10] The circuit court identified the standard it was applying as under Wis. Stat. § 907.02 as "the Daubert standard . . . named after Daubert versus Merrell Dow Pharmaceuticals, 509 U.S. 579, 1993." Furthermore, the transcript reveals that the circuit court actually applied this standard: in reaching its conclusion, the circuit court found that, although the tests had not been published in peer-reviewed journals, "these tests are routinely published," "have been written about, and even criticized," "were subject of extensive review," and "are widely used in predicting recidivism in sex offenders." These are among the factors that Daubert instructs courts to consider when evaluating whether expert testimony is admissible. See supra ¶¶8, 33.

¶35 These findings are also supported by the facts introduced at the Daubert hearing. There was testimony that the MnSOST-R has been the subject of 12 research inquiries and that the RRASOR has been the subject of approximately 35 studies. The testimony also establishes that these tests have been criticized, particularly with regard to how they measure the effect of age on the risk of recidivism, and that, despite this

---

[10] We note that, at the Daubert hearing, Jones did not dispute that Dr. Jurek was qualified or that Dr. Jurek had failed to apply his principles and methods reliably to the facts of Jones' case. See supra ¶23 ("And there was no evidence suggesting or even challenging that they administered the test incorrectly or interpreted the actuarial data incorrectly."). Rather, Jones' challenge focused on whether the MnSOST-R and RRASOR were based on sufficient facts and data and reliable principles and methods.

criticism, responsible examiners may responsibly use different actuarial instruments where it is "somewhat prudent to look at all the different assessments, and all the different factors and consider them for a particular individual."

¶36 Moreover, under <u>Daubert</u> these are the relevant facts a circuit court should consider. <u>See</u> <u>supra</u> ¶¶8, 33. The circuit court's findings therefore demonstrate that it considered the relevant facts, applied the proper standard, and articulated a reasonable basis for its decision. Thus, the circuit court did not erroneously exercise its discretion when it admitted Dr. Jurek's testimony regarding the MnSOST-R and the RRASOR. <u>Nat'l Auto Truckstops</u>, 263 Wis. 2d 649, ¶12.[11]

## IV. CONCLUSION

¶37 We consider one issue on review: whether the circuit court erroneously exercised its discretion under Wis. Stat. § 907.02(1) when it admitted expert testimony based on the results of the MnSOST-R and the RRASOR tests. We conclude that the circuit court did not erroneously exercise its discretion because it evaluated the relevant facts under the proper standard and articulated a reasonable basis for its decision.

¶38 Thus, we affirm the decision of the court of appeals.

---

[11] We emphasize that our decision is based on the circuit court's exercise of discretion. Our opinion should not be read as endorsing the admissibility of these instruments in all cases.

*By the Court.*—The decision of the court of appeals is affirmed.

¶39 REBECCA GRASSL BRADLEY, J. *(concurring)*. I join the majority opinion but write separately out of concern that the majority author cites her own concurrences as authority for legal principles instead of citing precedential majority opinions. The majority author cites to her past concurring opinions six times even though each citation could have been replaced with precedential authority. The legal propositions for which she cites her concurrences in prior cases are not novel legal points. I am concerned that allowing this practice to pass without notice will encourage future citations to past solo concurrences——creating majority opinions supported by one justice's separate writings instead of valid precedent.

¶40 Although "concurring opinions have often exercised a greater effect on subsequent cases than the majority opinions that they accompany," where possible,[1] we should cite to opinions that have binding precedential authority. See Igor Kirman, <u>Standing Apart to Be a Part: The Precedential Value of Supreme Court Concurring Opinions</u>, 95 Colum. L. Rev. 2083, 2084 (1995); <u>see also</u> <u>Ives v. Coopertools, a Div. of Cooper Indus., Inc.,</u> 208 Wis. 2d 55, 58, 559 N.W.2d 571 (1997) (per curiam) ("Our division on reasoning simply means that the analyses of the two concurrences have no precedential value." (citation omitted));

---

[1] I take no issue with using self-authored separate writings when, for example, no other authority exists for the proposition that a majority of the court has decided is a correct statement of the law. That is not the situation here.

1

State ex rel. Thompson v. Jackson, 199 Wis. 2d 714, 719, 546 N.W.2d 140 (1996) (per curiam) (citing State v. Elam, 195 Wis. 2d 683, 685, 538 N.W.2d 249 (1995) for the proposition that "[a] majority of justices must have agreed on a particular point for it to be considered the opinion of the court.").

¶41 Here, the majority author's repeated citations to her past concurrences are unnecessary. She could have replaced her concurrence citations in ¶¶6, 30 and 33 with citations to the precedential cases her concurrences quoted or cited.

¶42 More problematically, the majority author could have replaced her concurrence citations in ¶31 with a citation to State v. Giese, 2014 WI App 92, ¶18, 356 Wis. 2d 796, 854 N.W.2d 687 ("The court's gate-keeper function under the Daubert standard is to ensure that the expert's opinion is based on a reliable foundation and is relevant to the material issues." (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 n.7 (1993)))."

¶43 Parlaying a justice's own concurrence into a majority opinion under these circumstances is not good practice. Reliance on the majority opinion author's own separate writings six times in an opinion that cites only four precedential cases raises concerns over the soundness and scholarship of this opinion.

¶44 For these reasons, I concur.

¶45 I am authorized to state that Justices SHIRLEY S. ABRAHAMSON and DANIEL KELLY join this concurrence.

2