COURT OF APPEALS
DECISION
DATED AND FILED

December 10, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2022AP478-CR**
**2022AP479-CR**

Cir. Ct. Nos. 2018CM76
2018CF185

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

BRANDON JOSEPH TEASDALE,

DEFENDANT-APPELLANT.

APPEALS from judgments and an order of the circuit court for Marinette County: DAVID G. MIRON and JANE M. SEQUIN, Judges. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Brandon Teasdale appeals judgments convicting him, following a jury trial, of various offenses, all as a repeater and many as acts of domestic abuse.  He also appeals an order denying his motion for postconviction relief.[1]  Teasdale argues that his trial counsel was constitutionally ineffective by failing to: (1) challenge the admissibility of the State's expert witness testimony regarding victim recantation; (2) impeach that expert's testimony with informed cross-examination and/or with rebuttal expert testimony; and (3) call witnesses who would have corroborated the victim's trial testimony that Teasdale did not abuse her and discredited her original statement that Teasdale did abuse her.  We reject Teasdale's arguments and affirm.

## BACKGROUND

¶2    According to the criminal complaint in Marinette County case No. 2018CF185, on September 5, 2018, Tamara[2] reported to law enforcement that Teasdale, her boyfriend, had been physically abusing her.  Among other things, Tamara stated that a bruise on her face, lumps on her head, and other bruises on her body resulted from an incident that occurred approximately two weeks earlier.  During that incident, Tamara stated that Teasdale shoved her into some furniture, causing her to fall; punched and kicked her while she was on the ground; grabbed her off the floor by the neck; choked her while stating that "he would smash her face and not stop until she is dead if the cops get called on him"; and threw glass at her face.  Once Teasdale stopped choking Tamara, he told her that "next time he

---

[1] The Honorable David G. Miron entered the judgments of conviction.  The Honorable Jane M. Sequin entered the order denying Teasdale's motion for postconviction relief.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2021-22), we use a pseudonym when referring to the victim in these cases.  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

wouldn't stop until she was dead" and that he would make sure no one would find her body if she told law enforcement about what had occurred.

¶3 Tamara also stated that two days prior to her reporting the incident to law enforcement, Teasdale woke her up, accused her of lying about something, and started choking her while spitting in her face and calling her derogatory names. As he choked Tamara, Teasdale said she was going to die and asked her if she was ready. Tamara further stated that Teasdale choked her so hard that "she got lightheaded and fell to the floor" and that it still hurt to swallow. Tamara provided Officer Michael Kahles with a written statement of her allegations and completed a domestic violence packet, in which she listed five witnesses to the abuse: Sebastian Wood, Taira Zimmerman, Joey Crossman, Rob Ebbole, and Jeremy Davis. Law enforcement also took photographs of Tamara's injuries.

¶4 On September 7, 2018, the State charged Teasdale in Marinette County case No. 2018CF185 with felony intimidation of a victim, two counts of misdemeanor battery, strangulation and suffocation, disorderly conduct, and two counts of felony bail jumping, all as a repeater. All counts except the bail jumping charges were charged as acts of domestic abuse. According to the criminal complaint in Marinette County case No. 2018CM76, on September 8 and 9, 2018, Teasdale contacted Tamara from the Marinette County Jail and pleaded with her to recant her statement to law enforcement. Teasdale's phone calls with Tamara were recorded. As a result of these calls, the State charged Teasdale in Marinette County case No. 2018CM76 with five counts of misdemeanor intimidation of a victim, all as a repeater.

¶5 Tamara recanted her allegations in a written statement, dated September 9, 2018, and again during her testimony at the October preliminary

3

hearing. Both times, Tamara claimed that she made the allegations because she believed that Teasdale was going to leave her. At the preliminary hearing, she added that she had been angry and jealous. She also claimed that she had been drinking on the day she made the allegations. Tamara provided subsequent written statements to law enforcement and the district attorney's office again recanting the allegations she made in her original statement.

¶6      During pretrial proceedings, the State sought to introduce Wendy Gehl as an expert witness at trial to testify about issues related to domestic violence and to discuss the "Cycle of Violence" ("COV") and the "Power and Control Wheel" ("PCW"). According to the State's offer of proof, Gehl would also testify, among other things, about why domestic abuse victims "may recant or minimize statements made to law enforcement officers and others concerning domestic violence episodes." Teasdale's trial counsel did not object to Gehl's qualifications as an expert, but he objected to the admission of Gehl's testimony on the grounds that it was not relevant and was prejudicial to Teasdale because Tamara was not the typical victim that Gehl would be testifying about. The circuit court allowed Gehl to testify, noting that similar testimony had been accepted by courts in the past and that it would be helpful for the jury because it was difficult "for people to understand why somebody might … change their story on what happened, recant what happened, why people would keep going back to a domestic violence situation."

¶7      Marinette County case Nos. 2018CF185 and 2018CM76 were joined and tried to a jury. Tamara testified at trial that she reported the abuse to law enforcement and then she read aloud most of her original written statement, describing the incidents set forth in the criminal complaint. Tamara further testified that she spoke with Teasdale over the phone after she reported the abuse to law

enforcement. The State played seven recorded phone calls during which Teasdale convinced Tamara to recant, told her how to explain her injuries, and asked her to practice her story.[3]

¶8 Tamara then read aloud her written statement recanting her allegations. The written statement essentially said what Teasdale had instructed Tamara to say:

> I wrote a statement that [Teasdale] got violent with me, but it was a lie. I was afraid that he was leaving me and I was going to lose the bail money. And … he did not have anything to do with the bruises or marks on my body and face. I have been in the process of moving from my house to an apartment and I had some boxes fall on me and a wrought iron pole from my garden fell and hit my head which caused the bump and bruise to my face and head. I feel stupid and very wrong for putting that on [Teasdale]. I made up the story of him choking me in anger as I was embarrassed to say that we get a little rough in the bedroom and it's not really anybody's business, but that is why there were marks on my neck.

Tamara acknowledged that the statement she read mirrored what she and Teasdale had discussed in the recorded phone calls, but Tamara stated that what she wrote in her recanting statement is "what had happened." She also testified that she was already in the process of recanting her original statement before she talked to Teasdale and that she had been drinking heavily in the days before she made her original statement.

¶9 On cross-examination, Tamara again explained that her injuries were caused as described in her recanting statement, which involved the wrought iron pole, the moving boxes, and "sexual play in the bedroom." Tamara also explained

---

[3] The appellate records do not contain the recordings, but they do include transcripts of the phone calls, which were introduced as evidence at trial and provided to the jury.

that when she told Teasdale on the phone that she "wanted to live," she was referring to her continued drug and alcohol use, which she wanted to stop. She further described an incident where she called Teasdale to ask him to come home to check the injury caused by the wrought iron pole and testified that Wood was with Teasdale when this call occurred.

¶10    Gehl testified about her thirty-five years of working at Harbor House, which provides programs for victims of domestic violence. She also testified about her experience, training, and educational background, and she explained that she had testified as an expert witness on domestic abuse in Wisconsin courts approximately ten to twelve times. Gehl explained the COV and the PCW, which are theories developed by researchers in Duluth, Minnesota, and used in the field of domestic violence to help domestic abuse victims understand the behaviors in a domestic violence relationship.[4] Gehl further testified that she frequently used the COV and PCW in her work and that she found them to be reliable.

¶11    Gehl answered affirmatively when the State asked, "Based on your training and experience, is it common for victims of domestic violence to recant?" She also provided several reasons why victims recant. On cross-examination, Gehl testified that some victims of domestic violence do not recant while others do so, but she did not have a percentage of those who did and did not recant. She also agreed that sometimes people could fabricate allegations against a partner due to being angry or upset with a partner.

---

[4] Gehl testified that the COV shows how a relationship develops from "walking on eggshell[s]," to a period of "tension building," followed by a physical or verbal episode of violence, and then a "honeymoon phase" that includes apologies, regrets, and false promises of change. Gehl also explained that the PCW shows an abuser's "need to establish and maintain power and control over someone else" and how that is achieved "through tactics of violence and abuse."

¶12    Officer Kahles testified about his interview with Tamara on September 5, 2018. He described her demeanor as "crying, sobbing, hysterical" and detailed the injuries he observed on her. These characterizations were consistent with those made by two other police department employees who also testified. Kahles also testified as to Tamara's description of the quantity and types of abuse she suffered from Teasdale and her deep fear of him. Kahles further testified that Tamara did not appear to be under the influence of alcohol, and that he did not smell any alcohol on her when they spoke. However, he added that Tamara "could have possibly been under the influence of drugs."

¶13    Wood testified for the defense, stating that Teasdale was his best friend and that Teasdale and Tamara were "like brother and sister to [him]." He also testified about the incident Tamara described regarding her injury caused by the wrought iron pole. Wood further testified that Tamara was crying when he and Teasdale arrived at Tamara's home and that he could tell that she was hurt. Tamara did not say how she had been hurt, but Wood noted that he "could see the shepherd hook" in the corner. Teasdale chose not to testify.

¶14    The jury returned guilty verdicts on all counts in both cases, and the circuit court subsequently imposed aggregate sentences totaling twenty years and six months of initial confinement followed by nine years and six months of extended supervision.

¶15    Teasdale filed a postconviction motion seeking a new trial. As relevant to this appeal, Teasdale argued that his trial counsel was ineffective by

failing to request a ***Daubert***[5] hearing to challenge Gehl's expert testimony and by failing to investigate and present available witnesses who could corroborate Tamara's trial testimony that Teasdale did not abuse her. The circuit court held a ***Machner***[6] hearing, at which Teasdale's trial counsel, Tamara, Crossman, Ebbole, and Davis testified.

¶16    Teasdale also sought to present testimony from Dr. Kenneth Corvo, an expert who would challenge Gehl's qualifications and testify that Gehl's trial testimony "was based upon junk social science" that would not have satisfied the ***Daubert*** standard, if Teasdale's counsel had requested a ***Daubert*** hearing. The circuit court did not allow Corvo to testify, reasoning that competing expert testimony used to discredit Gehl did not make Corvo's testimony relevant to determining whether Teasdale's trial counsel rendered ineffective assistance by failing to request a ***Daubert*** hearing. Teasdale then filed an amended postconviction motion alleging an additional ineffective assistance of counsel claim on the grounds that his counsel failed to investigate whether the COV and the PCW were "actually legitimate" theories, failed to "investigate ways to cross-examine and discredit Gehl's testimony regarding" the COV and PCW, and failed to present expert testimony establishing that those theories lacked scientific validity.

---

[5] *See **Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579 (1993). The ***Daubert*** standard is a federal reliability standard codified in Federal Rule of Evidence 702, which governs the admissibility of expert testimony. **State v. Hogan**, 2021 WI App 24, ¶18, 397 Wis. 2d 171, 959 N.W.2d 658; *see also* FED. R. EVID. 702. WISCONSIN STAT. § 907.02, which governs the admissibility of expert testimony in Wisconsin, incorporates the ***Daubert*** reliability standard and assigns the circuit court a gatekeeping function to "ensure that the expert's opinion is based on a reliable foundation and is relevant to the material issues." **State v. Giese**, 2014 WI App 92, ¶¶17-18, 356 Wis. 2d 796, 854 N.W.2d 687; *see also* 2011 Wis. Act 2, § 34M.

[6] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶17 The circuit court allowed Teasdale to amend his postconviction motion, but the court ultimately denied the motion in a written decision, concluding that Teasdale's counsel was not ineffective in any of the alleged manners.[7] Teasdale now appeals. Additional facts will be provided as necessary below.

## DISCUSSION

¶18 On appeal, Teasdale renews his ineffective assistance of counsel claims based on his counsel's failure to: request a ***Daubert*** hearing; effectively cross-examine Gehl and/or present rebuttal expert testimony; and call Crossman, Ebbole and Davis as corroborating witnesses. An ineffective assistance of counsel claim requires the defendant to show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). The claim presents a mixed question of law and fact. ***State v. Breitzman***, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. We do not overturn the circuit court's factual findings unless they are clearly erroneous. ***Id.*** Whether counsel's performance was deficient and whether the deficient performance prejudiced the defense are questions of law that we review de novo. ***Id.***, ¶¶38-39. We need not address both prongs if the defendant fails to make a showing on one. ***Id.***, ¶37.

¶19 Counsel's performance is deficient if it falls "below an objective standard of reasonableness." ***Strickland***, 466 U.S. at 688. We strongly presume that counsel's conduct "falls within the wide range of reasonable professional

---

[7] In his motion for postconviction relief, Teasdale also sought sentence modification, which the circuit court denied. Teasdale does not renew his sentence modification claim on appeal, so we do not address it. *See **A.O. Smith Corp. v. Allstate Ins. Cos.**, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the [circuit] court, but not raised on appeal, is deemed abandoned.").

assistance," and we give counsel's strategic decisions great deference. **Breitzman**, 378 Wis. 2d 431, ¶38 (citation omitted). Prejudice requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Strickland**, 466 U.S. at 694. Reasonable probability means "a probability sufficient to undermine confidence in the outcome." **State v. Sholar**, 2018 WI 53, ¶33, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). "If there is no reasonable probability that the jury would have reached a different verdict, then a defendant has not proven prejudice." **Id.**, ¶46.

## I. *Daubert* **hearing and Gehl's testimony**

¶20 Teasdale argues that his trial counsel was deficient because he failed to investigate whether the COV and PCW theories were scientifically valid theories and whether Gehl was qualified to offer an opinion on the frequency of recantations by victims of domestic violence based on those theories. According to Teasdale, had his counsel investigated the COV and PCW theories, he would have learned that those theories "have been widely rejected by domestic abuse experts as being unscientific and unreliable" and that Gehl's testimony would have failed to satisfy the *Daubert* standard.

¶21 At the *Machner* hearing, Teasdale's trial counsel testified that he did not file a *Daubert* motion because he believed it would have been unsuccessful. Counsel explained that he reviewed Gehl's CV and believed she was qualified to testify in domestic abuse cases because counsel knew that Gehl, among other professional qualifications, had testified in other Wisconsin circuit courts approximately nine or ten times. Counsel also testified that he was familiar with the COV and PCW theories and, although he did not specifically investigate whether

10

those theories had any support within the scientific community, counsel knew that those theories had been used, introduced, and admitted in multiple trials in Wisconsin generally and in Marinette County specifically "in regard to these kind of cases." Counsel further explained that his trial strategy was not to discredit these theories, but to instead argue that the COV and PCW theories did not apply in Teasdale's case, given the facts and theory that the defense would present that no abuse happened in the first place.

¶22    Given the above testimony from Teasdale's counsel, we conclude, as the circuit court did, that counsel's decision not to request a ***Daubert*** hearing to challenge Gehl's testimony was reasonable and, therefore, did not constitute deficient performance. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." ***Strickland***, 466 U.S. at 691. Thus, when evaluating counsel's decision not to investigate, we avoid the "distorting effects of hindsight," ***id.*** at 689, and "assess the decision's reasonableness in light of 'all the circumstances,' 'applying a heavy measure of deference to counsel's judgments,'" ***State v. Carter***, 2010 WI 40, ¶23, 324 Wis. 2d 640, 782 N.W.2d 695 (citation omitted).

¶23    Given the information available to counsel at the time of Teasdale's trial—namely, counsel's general familiarity with the COV and PCW theories, counsel's knowledge that the theories had been regularly accepted in Wisconsin courts, and counsel's belief that Gehl was qualified to testify—counsel had a reasonable belief that a ***Daubert*** motion would have been unsuccessful. Counsel was aware of Gehl's knowledge, skill, experience, training and education (including thirty-five years in the domestic violence field), and counsel knew that Gehl had previously testified in Wisconsin courts nine to ten times on domestic violence

issues. In light of the circumstances, counsel's decision not to further investigate whether the COV and PCW theories were scientifically valid was a reasonable one.

¶24 Furthermore, Teasdale has not met his burden to show that his counsel performed deficiently by failing to request a *Daubert* hearing to challenge Gehl's testimony based on the validity of the COV and PCW theories. Teasdale relies exclusively on Dr. Corvo's proffered testimony to contend that the COV and PCW theories "have been widely rejected by domestic abuse experts as being unscientific and unreliable" and to then conclude that the circuit court would have excluded Gehl's testimony. Teasdale, however, does not cite cases from any jurisdiction in which any court has determined that expert testimony on the COV and PCW theories was inadmissible under *Daubert*.

¶25 In addition, Gehl relied on her years of training and experience, rather than the COV and PCW theories per se, to affirmatively answer that it was common for victims of domestic violence to recant and to provide specific reasons why such victims recant. "[P]ersonal knowledge and experience may form the basis for expert testimony." *State v. Hogan*, 2021 WI App 24, ¶25, 397 Wis. 2d 171, 959 N.W.2d 658; *see also* *Seifert v. Balink*, 2017 WI 2, ¶77, 372 Wis. 2d 525, 888 N.W.2d 816. Teasdale does not explain why Gehl's opinions regarding the frequency and reasons for domestic abuse victims to recant their allegations are not proper subjects for Gehl's expert testimony on these grounds alone, other than to baldly and summarily state that Gehl was unqualified. The record does not support this assertion, and the circuit court did not err by implicitly determining otherwise. Counsel could not have been deficient by failing to request a *Daubert* hearing that would not have resulted in the exclusion of the recantation testimony that Teasdale challenges on appeal. *See* *State v. Wheat*, 2002 WI App 153, ¶23, 256 Wis. 2d 270, 647 N.W.2d 441 ("Trial counsel's failure to bring a meritless motion does not constitute deficient

performance."); *see also* **State v. Bednarz**, 179 Wis. 2d 460, 466, 507 N.W.2d 168 (Ct. App. 1993) ("[E]xpert opinion regarding a victim's recantation in domestic abuse cases is permissible.").[8]

¶26    In sum, Teasdale's criticisms regarding Gehl's expert testimony— e.g., Gehl's inability to testify to the specific percentage of domestic violence victims who recant and the alleged lack of "rigorous empirical evidence" that "supports the predictive validity" of the theories—is properly directed at the weight, not the admissibility, of Gehl's opinions, especially those regarding issues with the validity of Tamara's recantation.    Teasdale has failed to prove—either in his postconviction materials or now on appeal—his fundamental premise that Gehl's opinions were invalid.    Moreover, Teasdale's counsel did elicit testimony during Gehl's cross-examination that she did not know the specific percentage of domestic violence victims who recanted and that she could not say whether Tamara's behaviors fit the behaviors in the COV and PCW.

¶27    Even were we to assume that counsel's failure to request a **Daubert** hearing to challenge Gehl's testimony was deficient, we also conclude that Teasdale cannot show there is a reasonable probability that, but for counsel's failure to request the **Daubert** hearing, there would have been a different outcome.    Stated differently, the lack of a **Daubert** hearing does not undermine our confidence in the outcome.

---

[8] We note that **State v. Bednarz**, 179 Wis. 2d 460, 507 N.W.2d 168 (Ct. App. 1993), is a case that preceded Wisconsin's adoption of the **Daubert** standard and applied a different—and more permissive—standard for the admissibility of expert testimony under a previous version of WIS. STAT. § 907.02(1). **Bednarz**, 179 Wis. 2d at 466-68; *see also* WIS. STAT. § 907.02 (1993-94); **State v. Jones**, 2018 WI 44, ¶¶6, 29-32, 381 Wis. 2d 284, 911 N.W.2d 97 (discussing the differences between the two standards).    Nevertheless, **Bednarz** has not been overruled and remains binding precedent on the general proposition that experts can testify regarding the phenomenon of victim recantation in domestic abuse cases.

¶28    Teasdale argues that his trial counsel's failure to request a **_Daubert_** hearing was prejudicial because Gehl's testimony "went directly to the central issue before the jury—whether to believe [Tamara]'s original complaint or her subsequent recantations." Had Gehl's testimony been excluded, Teasdale contends that the remaining evidence—Tamara's testimony that Teasdale did not abuse her— "would have cast doubt on the State's case and had an impact on the verdict favorable to Teasdale." As the State notes, Gehl's testimony "would have been important if no evidence had been presented about why [Tamara] had recanted." But the State played for the jury seven recorded phone calls between Teasdale and Tamara that manifestly showed why Tamara recanted her original statement and that strongly helped to confirm the truth of Tamara's original statement.

¶29    In the first call, Teasdale repeatedly asked Tamara to help him and to answer his calls so they could "figure something out." Tamara responded to his pleas with "I can try" and asked Teasdale whether he "understand[s] what [he's] done." She also told Teasdale that she "just want[s] to live," and he responded by promising that he would leave her alone and that he would go to counseling. After agreeing to help Teasdale, Tamara asked, "What do I do? I don't know what to do." Teasdale responded, "Just don't worry about it right now. It's not the time or place to talk about it."

¶30    In the second call, Teasdale told Tamara that she had to say he did not do anything, that she had to go to the police station and "get some statement forms," that he "hope[d] [she] spen[t] some time with a pen and a paper and wr[ote] this stuff down," and that she "might get in trouble doing this." In the third call, Teasdale stated that he wanted "to make sure we do this the correct way, you know, not in haste" and told Tamara that she had "to remember what to say and say it correctly." Tamara then stated that she would "go to the police station … and talk

to them and tell them I want to open this up and then re-write a thing." Teasdale responded, "So just practice it up, all right?"

¶31    The fourth call mirrored Tamara's recantation statement that she read at trial and her testimony on cross-examination. In that call, Teasdale instructed Tamara to:

> [G]et the cop there and say I'm sorry, but I did not tell the truth about [Teasdale] in my first statement.… I lied about everything. I was afraid he was going to leave me. We were having a tough time in our relationship.… And I was afraid he was going to leave me and I was afraid about my money, my $10,000 bail. I was afraid about that too.… He did not hit me. The marks on my face came from when we were moving boxes and a wrought iron [pole].… [T]he ones on the neck you're going to have say that the marks on my body came from … the privacy of our bedroom.

As he gave her these instructions, Tamara repeatedly agreed by saying "Okay" and "I know." Teasdale reiterated these instructions throughout the phone call and then asked Tamara to "[j]ust please write it out a couple times. Type it out and practice it so you can speak it to these people without them, you know, interrupting you." He also told Tamara to "pound" this information into her head, to which she responded, "[D]on't say it like that."

¶32    In the fifth call, Teasdale told Tamara to go to the police station to get a statement form to fill out. He further stated, "I want to hear what you're going to say because it's got to be good.… It's got to take all of it off of me, every single ounce. You can't leave any of it on me. You understand?" Tamara replied, "I know, [b]aby." In the sixth call, Tamara informed Teasdale that she had "a whole new" statement and that she "ripped up the old one and draft[ed] a new one."

¶33 In the final call, Teasdale and Tamara argued, with Teasdale calling Tamara a "dumb bitch" and a "liar." In response to Teasdale's comment about Tamara "pay[ing her] dues," Tamara responded, "How many days do I have to get beat?" Teasdale replied: "And see what you're saying on the phone? You're being a dumb bitch again, a stupid bitch. So with us arguing, you're going to go back to the first statement, huh?"

¶34 In all, the recorded phone calls show that Teasdale asked and convinced Tamara to recant and that he instructed her on the story to tell about her injuries, including ways they happened rather than by abuse. Furthermore, a number of Tamara's and Teasdale's statements on the calls evidenced prior abusive conduct by Teasdale toward Tamara and showed her fears of such abuse in the future. The calls also tend to contradict Tamara's trial testimony that she was already in the process of recanting her original statement before talking to Teasdale.

¶35 In sum, Teasdale fails to show he was prejudiced by his trial counsel's failure to request a ***Daubert*** hearing to challenge Gehl's testimony. Even if Gehl had been precluded from testifying, Teasdale has neither shown there is a reasonable probability that the jury would have reached a different result nor undermined our confidence in the trial's outcome, given the evidence of Teasdale's recorded phone calls and Tamara's mirroring recantation.[9]

---

[9] For the same reasons, we reject Teasdale's alternative argument that his trial counsel was ineffective by failing to counter Gehl's testimony on the COV and PCW theories with either "an informed cross-examination" of Gehl and/or rebuttal testimony on the theories' scientific validity. Even assuming counsel was deficient on this ground, Teasdale still cannot show there is a reasonable probability that the jury would have reached a different result given that Gehl's testimony about the reasons that victims recant was not particularly important when compared to the seven recorded phone calls that amply explained the actual reasons why Tamara recanted her original statement.

## II. Other witnesses' testimony

¶36    Teasdale next asserts that his trial counsel was deficient because counsel was aware that Tamara listed Crossman, Ebbole and Davis as "witnesses to the domestic abuse" in her domestic violence packet,[10] but counsel did not investigate these witnesses or how they would have testified.  At the ***Machner*** hearing, these individuals testified that they had not witnessed Teasdale abuse Tamara at any time.  Teasdale contends that his counsel's failure to call these witnesses was prejudicial because their testimony would have corroborated Tamara's trial testimony and discredited her original statement to law enforcement. Teasdale further argues that the testimony from these witnesses "would have been helpful to the defense as it establishes the theory of defense that the alleged domestic abuse did not happen and that [Tamara] had lied in her original complaint."

¶37    At the ***Machner*** hearing, Teasdale's counsel testified that he was aware of Crossman, Ebbole and Davis, but he did not call them because they were not physically present when the alleged abuse or other injury-causing events occurred.  Wood, however, was present and observed the injuries allegedly caused by the wrought iron pole, and that is why counsel called him as a witness at trial. Counsel testified he saw no reason to talk with Crossman, Ebbole and Davis because Teasdale had told counsel that the only witnesses to the alleged injury-causing incidents were Teasdale, Tamara and Wood.

¶38    Assuming, without deciding, that counsel was deficient by failing to call Crossman, Ebbole and Davis as witnesses, Teasdale has not shown there is a reasonable probability that the jury would have reached a different result if those

---

[10] The other witness Tamara had listed in the packet, Taira Zimmerman, passed away before Teasdale's trial.

individuals had testified. Such testimony would have done little to discredit Tamara's original statement, given that the testimony was unrelated to the alleged incidents for which Teasdale was on trial. Crossman, Ebbole and Davis could testify only that they never saw Teasdale abuse Tamara. However, Wood already said the same thing, and he did so in a context of also plausibly explaining Tamara's injuries that were manifest at the time she reported the abuse to the police. Furthermore, and again, the seven recorded phone calls plainly show that Teasdale convinced Tamara to recant and that Teasdale instructed her on how to explain her injuries. For the reasons noted above, the phone calls also strongly tended to show that Tamara's original statement was true and that her recantation was false.

¶39 In addition, testimony from two witnesses who observed Tamara's physical injuries at the time she reported the abuse also strongly supported her original statement. Officer Kahles testified that he noticed bruises under one of Tamara's eyes and on the side of her face and that the bruises appeared to be a few days old. Mary Cherry, a public service officer, testified that she observed bruises on Tamara's face and thigh and saw some scratches on Tamara's ankles. Cherry also took photographs of Tamara's injuries, and those photographs were introduced into evidence at trial. Both of these witnesses also testified about Tamara's severely distraught emotional state at the time she reported Teasdale's abuse. Unlike Wood, who described the alleged incident with the wrought iron pole, Crossman, Ebbole and Davis would not have testified to any incidents that could explain Tamara's other injuries. Their testimony would have been cumulative at best.

¶40 Given all of the foregoing, we conclude that Teasdale has not shown there is a reasonable probability that the jury would have reached a different result had Crossman, Ebbole and Davis testified at trial.

18

*By the Court.*—Judgments and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.