COURT OF APPEALS
DECISION
DATED AND FILED

June 10, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1628-CR**

Cir. Ct. No. 2018CF1205

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JOSEPH M. ZASTROW,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Marathon County: GREGORY B. HUBER and RICK T. CVEYKUS, Judges. *Affirmed.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Joseph M. Zastrow appeals a judgment of conviction, entered following a jury trial, for repeated sexual assault of the same child and an order denying his motion for postconviction relief.[1] Zastrow argues that several comments the prosecutor made during the State's opening statement and closing argument constituted plain error. He also argues that his trial attorney was constitutionally ineffective in multiple respects. We reject Zastrow's arguments and affirm.

## BACKGROUND

¶2    The State charged Zastrow with repeated sexual assault of the same child based on allegations that he had sexually assaulted Alice, the daughter of his former girlfriend, in 2016, while Alice was sleeping in her bed at night.[2] The matter was tried to a jury in November 2021.

¶3    At trial, the State began its opening statement by telling the jury:

> [W]e're all well aware of the image of a sleeping child. It's a familiar image; it's a calming image. It's used in advertisements everywhere; you see the little child with their blankets pulled around them, tucked into their bed, by our home insurance. A child sleeping in the backseat of a car because the car is so safe. It's an image we all keep and we all have, to sleep like a child. To sleep like a baby. Sitting in your room, surrounded by your own things, tucked in, warm, maybe a stuffed animal, safe and secure with your mother, father, or your guardian watching out for

---

[1] The Honorable Gregory B. Huber presided over Zastrow's jury trial and entered his judgment of conviction. The Honorable Rick T. Cveykus entered the order denying Zastrow's postconviction motion. For the remainder of this opinion, we refer to Judge Huber as the circuit court and to Judge Cveykus as the postconviction court.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we use pseudonyms when referring to the victim, her mother, and her siblings. All references to the Wisconsin Statutes are to the 2023-24 version.

you.  But every child has a monster.  Maybe under the bed or maybe we keep them in the closet.

¶4    The State then continued its opening statement by detailing the allegations that Zastrow had sexually assaulted Alice while she was sleeping in her bed.  At the end of its opening statement, the State returned to the idea of a sleeping child with a monster under the bed, stating that Alice

doesn't have that peaceful image anymore.  She isn't that sleeping child; she wasn't that sleeping child.  She has over and over again dealt with having that moment, that vulnerability, asleep with her eyes closed in the darkness taken from her.  The security is gone now.  There is no image of the sleeping child and the reason is: Not every monster stays under the bed.

¶5    Thereafter, the State introduced evidence that in February 2018, Alice reported to her guidance counselor that Zastrow had repeatedly sexually assaulted her two years earlier.  Alice made the report after hearing a school presentation on sexual assault and sexting.  Alice's counselor contacted a school resource officer, who then notified the police.  About one month later, forensic interviewer Alicia Resch interviewed Alice at the Child Advocacy Center.  The interview was video recorded and was played for the jury at trial.

¶6    During the forensic interview, Alice told Resch that Zastrow, her mom's ex-boyfriend, "used to touch [Alice] inappropriately."  Alice stated that this touching occurred when Alice was twelve years old and in sixth grade.  She told Resch that Zastrow touched her "down here," gesturing to the area between her legs.  Alice later stated that Zastrow touched her "all over down there" and explained that he touched the body part from which she peed.  According to Alice, Zastrow would touch her with his finger or lick "down there" with his tongue.

¶7     Alice explained that she and her younger brother, Ben, slept in the living room of her family's apartment. When asked to describe a specific time when Zastrow touched her inappropriately, Alice recounted a time when she was sleeping on her bed in the living room and her mom was sleeping on a couch in the same room. Alice remembered that she was sleeping with multiple blankets because it was winter and the living room was cold due to a broken window in the apartment. Alice stated that Zastrow "threw blankets over [her] face," took her shorts off, moved her underwear to the side, and started touching her. When Alice tried to "fight back a little bit," Zastrow said, "You tell anybody and I'll hurt your mom," which "really scared" Alice. Zastrow stopped touching Alice when her mom stirred. Alice stated that both her mom and Ben are heavy sleepers.

¶8     Alice told Resch that the touching happened "for a whole month and after that it happened for a week." She also stated that the touching happened "every night," always while she was sleeping in the living room, and that Zastrow would wait to touch her until her mom fell asleep. She initially stated that the touching happened during summer break before the school year started, but she then stated that it also happened during the school year.

¶9     Alice further stated that she told her mom about the sexual assaults, but her mom did not initially believe her. Alice explained that her mom knew that she did not like Zastrow because he was "always mean to [Alice] but he was nice to everybody else." Alice stated that she ultimately told Ben about the assaults, and Ben told their older brother, Mark. According to Alice, Mark then stayed up one night, snuck into the living room, and saw Zastrow leaning over her. Mark then confronted Zastrow while holding a BB gun and told him to back away from Alice. Zastrow claimed that he was just covering Alice up with a blanket. Alice stated that Mark then woke their mom and told her what had happened, their mom

called the police the next morning, and the police came to their apartment to investigate.

¶10  Alice told Resch that the repeated sexual assaults made her feel sad and depressed. She stated that she was "the lonely girl who would sit in the back of the room at classes," and when she returned home from school, she would go straight to a "back room" in her apartment and cry while doing her homework.

¶11  At trial, Alice testified that in 2016, she lived in an apartment with her mom, her two brothers, her sister, and Zastrow. She explained that she and Ben slept in the living room because her family "lived in a three-bedroom apartment and [her] siblings had all the bedrooms." Alice initially testified that Zastrow began touching her "as soon as [she] turned 11." She then testified, however, that Zastrow began touching her in July 2016[3] and that the touching occurred almost every day until she turned 13 in 2017. She repeatedly stated that she "zoned out" during the assaults.

¶12  Alice specifically described the first time that Zastrow assaulted her in July 2016. She testified that Zastrow came to her bed in the living room at night, covered her face with blankets, took her pants off, and touched her vagina with his hand. Zastrow whispered in her ear that he would kill her mom if she told anyone about the assault. Alice recounted another time that Zastrow touched her vagina while her mom slept on the living room couch. She testified that her mom is a "very heavy sleeper." She also testified, consistent with her forensic

---

[3] The record indicates that Alice would have turned twelve during the summer of 2016.

interview, that Zastrow would sometimes touch her vagina with his tongue during the assaults.

¶13    Alice also testified regarding an additional assault that occurred after she turned 13, which was the only time when Zastrow penetrated her vagina.  She stated that Zastrow started by "licking" her, and she then felt "[a] really bad pain down there," after which she "kind of screamed and took off to the bathroom." Alice did not know what Zastrow used to penetrate her vagina.

¶14    Alice testified that she told her mom about the assaults when she was twelve, but her mom did not believe her.  She testified that the assaults stopped in 2017, when she was 13, after Ben woke up during one of the assaults and told their mom.  Alice testified that their mom then installed cameras in the apartment, but the cameras "kept getting unplugged."  When asked whether she had spoken to anyone outside her family about the assaults, Alice responded, "Yeah.  When I was 15, I told my middle school."  She did not testify about any police investigation regarding the assaults in 2016.

¶15    Alice's mom, Martha, confirmed that in 2016, she lived in a three-bedroom apartment with Zastrow and her four children.  She confirmed that she and Zastrow slept in the primary bedroom, that Alice's two older siblings had their own bedrooms, and that Alice and Ben slept "on a trundle bed and daybed in the living room."  Martha also testified that she sometimes slept on a couch in the living room, which was "[r]ight across from the kids' bed."

¶16    Martha testified that she was "made aware" of a "situation" between Alice and Zastrow in 2016.  Thereafter, she placed "nanny" cameras that looked like air fresheners in the home in an attempt to gather information about the situation.  She explained that the cameras were plugged into the wall and stored

video footage on SD cards. She noticed, however, that the cameras "were being unplugged" while she was not at home. She also testified that she was not able to retrieve videos from the cameras' SD cards "because the SD cards disappeared," meaning that "[s]omebody took them out of the cameras." She acknowledged, however, that she was able to view some video footage, which did not show Zastrow sexually assaulting Alice.

¶17 Martha further testified that before the summer of 2016, Alice was "very outgoing. She played the violin. She was in track and field. She loved to play video games with us and be around us all, all of the time." Beginning in 2016, however, Alice began "exclud[ing] herself and was constantly fighting us, wouldn't go to school, and quit violin." Martha testified that Alice would "[l]ock herself in the bedroom or the bathroom" and that she started "failing" her classes at school. Martha also testified that Alice "tried killing herself," but Martha did not provide any additional details about that subject.

¶18 On cross-examination, Martha acknowledged that she did not report the sexual assaults to police when she first learned about them in 2016. She testified that the first time she spoke to a police officer about the assaults was in 2018, after Alice reported the assaults at school. She also testified that she "kicked [Zastrow] out" of her home at the end of October 2016.

¶19 Both of Alice's brothers testified at trial. Ben testified that he never saw anything between Alice and Zastrow that was "concerning" to him. He did testify, however, that at one point he woke up in the middle of the night and saw Zastrow standing over Alice's bed.

¶20 Alice's older brother, Mark, testified that Zastrow normally left for work between 5:00 and 7:00 a.m. However, Mark would sometimes see Zastrow

awake in the living room at around 2:00 or 3:00 a.m., while Mark was awake playing video games, which Mark found to be "odd." Mark testified that the only time he confronted Zastrow with a BB gun was when he was interrupting a fight between Zastrow and Martha. He denied having any confrontation with Zastrow about Alice.

¶21 Resch, who conducted Alice's forensic interview, testified as an expert on childhood disclosure of sexual abuse. Resch testified that delays in disclosure are common and that children can vacillate between periods of disclosure and nondisclosure depending on a variety of circumstances. She also discussed various "barriers" and "facilitators" to disclosure. For instance, a victim's youth and the fact that the abuser lives in the victim's home are barriers to disclosure. Conversely, "prevention services at school when kids have educational talks about appropriate touches and abuse" may facilitate disclosure.

¶22 Zastrow elected not to testify in his own defense at trial. The defense rested without presenting any evidence.

¶23 At the beginning of its closing argument, the State returned to the idea of a sleeping child that it had first raised during its opening statement, stating:

> Yesterday morning when we started this, I discussed the image of a sleeping child. I think a lot of our ideas on that are going to be affected by everything we have heard over the last two days now. We came into this trial—everybody came in here with certain presumptions, that bias that we were talking about when we were doing jury selections. Assumptions about our world. The world around us and the way things work.
>
> We don't want to have to live in a world where we can't trust the people that are next to us in [a grocery store] picking up milk and the people at [a gas station] filling up the gas right next to us in their car. We want to figure that we can just nod at them, everything is fine, and we don't

have to worry about the people around us. We have assumptions about our world.

¶24 The State subsequently discussed its view of the evidence introduced at trial and argued that the evidence supported a guilty verdict on the repeated sexual assault of a child charge. In so doing, the State acknowledged certain inconsistencies between Alice's testimony, her forensic interview, and the testimony of the other witnesses, but the State nevertheless argued that the jury should find Alice's version of events to be credible because her testimony about the assaults themselves was "uncontested":

> And now in all of the questioning that you've heard, [the] defense has made points of: Well, what if she got this part wrong? What if [Mark] is defending mom instead of her? What if she is wrong about whether it was winter or summer?
>
> Here is what has never been conte[st]ed: It is uncontested that [Alice] is in bed in the summer of 2016; Joseph Zastrow comes to her and wakes her by pulling her pants down; that's what wakes her up; she's asleep and woken by that and Joseph Zastrow touches her vagina.

Additionally, the State argued that Alice had no motive to lie because it was difficult for her to talk in front of strangers about being sexually assaulted and because her mother had already kicked Zastrow out of the home and removed him from her life when she reported the assaults at school.

¶25 The State ended its closing argument by returning to the image of a monster under a sleeping child's bed, stating:

> Joseph Zastrow is in the living room. There is not much room under the bed because he has the pull-away bed. There is no closet because it's the living room. Joseph Zastrow had nowhere else to be because there is no other place for the monsters to hide in the living room. Joseph Zastrow is in that living room. He is touching an 11-year-old girl and then a 12-year-old girl as she gets

9

older. There is no other way to describe this and Joseph
Zastrow is guilty. I ask you to find him so.

¶26 In her closing argument, Zastrow's trial attorney argued that Alice's allegations regarding the sexual assaults were not reliable. Trial counsel highlighted inconsistencies between Alice's trial testimony and her 2018 forensic interview regarding the time period when Zastrow had allegedly sexually assaulted her. Counsel argued that these inconsistencies, and the fact that the assaults were not reported to the police in 2016, indicated that "[t]here was nothing to report in 2016 because it didn't happen."

¶27 Zastrow's trial attorney also highlighted other claims made during Alice's testimony and forensic interview that were not corroborated by other witnesses. For instance, while Alice claimed that Mark had confronted Zastrow with a BB gun when he saw Zastrow standing over Alice's bed, Mark denied that any such confrontation occurred. Additionally, contrary to Alice's testimony, Ben denied witnessing anything concerning between Zastrow and Alice. Furthermore, while Alice claimed in her forensic interview that the police were called in 2016 after she first reported the sexual assaults to her mom, defense counsel emphasized that there was no record that the assaults were reported to the police in 2016. Defense counsel also noted that the nanny cameras, "when they were on, didn't show anything." In addition, counsel emphasized that Alice disliked Zastrow and suggested that Alice had accused him of sexual assault after his relationship with Martha "ended badly."

¶28 In its rebuttal closing argument, the State again acknowledged what it characterized as minor inconsistencies in Alice's accounts of the sexual assaults; however, the State argued:

10

> I want you to focus on what [Alice] is very consistent on—
> and that's the part I have said over and over again—
> Joseph Zastrow came to her at night, in her bed, touched
> her vagina, night after night, several times, more than three
> times. That part has never changed.

The State also argued that Alice's dislike of Zastrow provided "no motive to lie" because "Zastrow is not even in the house. She's not seeing him. What is she trying to do to him? He is not even a part of her life. That part is over." The State continued:

> She has no motive to lie unless you think that what she
> wants is to have come here and sat in that chair there … in
> this room, in a room that until this week she had never been
> in basically. She had never been in this room until this
> week. And she obviously wanted to tell all of you about
> her vagina. That's what you would have to believe, to
> believe what the defense is telling you at this point that that
> is her motive to lie.

¶29 The jury found Zastrow guilty of repeated sexual assault of the same child. The circuit court subsequently sentenced Zastrow to nine years' initial confinement followed by six years' extended supervision.

¶30 Zastrow filed a postconviction motion for a new trial. He alleged that the State made improper comments during its opening statement and closing argument by: (1) improperly commenting on his constitutional right to silence by describing Alice's allegations as "uncontested"; (2) improperly shifting the burden of proof to Zastrow by arguing that, in order to acquit Zastrow, the jury would have to find that Alice was lying about the sexual assaults; (3) improperly describing Zastrow as a "monster"; and (4) making an improper "golden rule" argument by commenting on how difficult it was for Alice to testify in court about the alleged assaults. Zastrow asserted that these remarks, both individually and in combination, warranted a new trial.

11

¶31     Zastrow also argued that his trial attorney was constitutionally ineffective for several reasons. First, he asserted that his trial attorney was constitutionally ineffective by failing to object to the State's improper remarks during its opening statement and closing argument. Second, he claimed that his trial attorney was ineffective by failing to investigate a potential witness—Zastrow's nephew, Mitchel Freda—who was "physically present in the apartment and awake during the alleged sexual assaults" and "would have been able to confirm that the alleged sexual touching did not occur during the summer of 2016." Third, he claimed that his trial attorney was ineffective by failing to object to the testimony regarding the video cameras in the apartment. Fourth, Zastrow argued that his trial attorney was ineffective by failing to object to the State's "inadmissible character evidence" regarding Alice's behavioral changes and suicide attempt. Fifth, Zastrow argued that his trial attorney "employed a reasonable strategy of questioning [Alice's] inconsistencies and recollection" but did not execute that strategy "in a reasonable manner" because she failed to "confront [Alice] about her numerous inconsistent and illogical statements … during cross-examination."[4]

¶32     The postconviction court held a ***Machner***[5] hearing, at which Freda, Zastrow's trial attorney, and Zastrow's mother testified. Their testimony is discussed in greater detail below, as necessary.

---

[4] Zastrow raised several additional arguments in his postconviction motion, beyond those summarized above. He does not, however, renew those additional arguments on appeal. Accordingly, we deem them abandoned, *see **A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998), and do not address them further.

[5] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶33    Following the *Machner* hearing, the postconviction court denied Zastrow's motion for a new trial in all respects.  The court concluded that the challenged remarks from the State's opening statement and closing argument were not improper.  The court further concluded that Zastrow's trial attorney did not perform deficiently by failing to object to the testimony regarding the video cameras because that testimony was admissible.  Next, the court determined that trial counsel's failure to object to the testimony about Alice's behavioral changes was neither deficient nor prejudicial because the testimony did not qualify as "character evidence," and, in any event, "the totality of these fleeting statements would not prejudice the outcome of the trial."  The court further determined that trial counsel's strategy of "attack[ing] the credibility of the victim through other witnesses," rather than attacking the victim's credibility directly on cross-examination, was reasonable and did not constitute deficient performance.

¶34    Finally, the postconviction court concluded that Zastrow's trial attorney performed deficiently by failing to investigate Freda as a potential witness.  The court determined, however, that counsel's error in that regard was not prejudicial because Freda's testimony would not have affected the outcome of Zastrow's trial.

¶35 Zastrow now appeals his judgment of conviction and the order denying his postconviction motion.[6]

## DISCUSSION

### I. Plain error

¶36 On appeal, Zastrow renews his claims that the State made various improper remarks during its opening statement and closing argument. Improper comments by a prosecutor "can rise to such a level that the defendant is denied his or her due process right to a fair trial." *State v. Wolff*, 171 Wis. 2d 161, 167, 491 N.W.2d 498 (Ct. App. 1992). Although a prosecutor is generally given latitude when making arguments to the jury, "[t]he line between permissible and impermissible argument is drawn where the prosecutor goes beyond reasoning from the evidence and suggests that the jury should arrive at a verdict by considering factors other than the evidence." *State v. Neuser*, 191 Wis. 2d 131, 136, 528 N.W.2d 49 (Ct. App. 1995). To determine whether a prosecutor's comments crossed that line, we must ask whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Jorgensen*, 2008 WI 60, ¶40, 310 Wis. 2d 138, 754 N.W.2d 77.

---

[6] We pause to note that Zastrow's appellate briefs do not comply with WIS. STAT. RULE 809.19(8)(bm), which requires a brief to "have page numbers centered in the bottom margin using Arabic numerals with sequential numbering starting at '1' on the cover." Our supreme court has explained that this pagination requirement "will match the page number to the page header applied by the eFiling system, avoiding the confusion of having two different page numbers." S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021). We admonish Zastrow's attorney that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2).

¶37 Zastrow concedes that his trial attorney did not object to the State's allegedly improper remarks during its opening statement and closing argument. "[F]ailure to object, even to a claimed structural constitutional violation, forfeits the challenge." *State v. Klapps*, 2021 WI App 5, ¶29, 395 Wis. 2d 743, 954 N.W.2d 38 (2020). Zastrow argues, however, that he is nevertheless entitled to relief because the State's remarks constituted plain error.

¶38 "The plain error doctrine allows appellate courts to review errors that were otherwise waived by a party's failure to object." *Jorgensen*, 310 Wis. 2d 138, ¶21; *see also* WIS. STAT. § 901.03(4). To qualify as plain error, the error must be fundamental, obvious, and substantial. *Jorgensen*, 310 Wis. 2d 138, ¶21. For instance, the plain error doctrine should be used "where a basic constitutional right has not been extended to the accused." *Id.* (citation omitted). However, "[c]ourts should use the plain error doctrine sparingly." *Id.*

¶39 The existence of plain error turns on the facts of the particular case and may depend upon both the seriousness of the error and the quantum of evidence properly admitted. *Id.*, ¶22. "[N]ot all inappropriate statements by a prosecutor result in a due process violation that gives rise to plain error." *Id.*, ¶41. Even if the prosecutor "steps across the permissible boundary, we must then determine whether the incursion is so significant (either alone or in combination with other infractions) that it renders the entire trial unfair." *State v. Bell*, 2018 WI 28, ¶40, 380 Wis. 2d 616, 909 N.W.2d 750. Whether a prosecutor's allegedly improper remarks constituted plain error is a question of law that we review independently. *See id.*, ¶8.

### A. *Shifting the burden of proof*

¶40 "It is axiomatic that the State must prove all the elements of a crime beyond a reasonable doubt to convict a defendant." *State v. Kuntz*, 160 Wis. 2d 722, 736, 467 N.W.2d 531 (1991). Here, Zastrow argues that the State impermissibly shifted the burden of proof to him during the rebuttal portion of its closing argument when it argued that Alice had no motive to lie, unless the jury believed that Alice wanted to testify in court about her vagina, and "[t]hat's what you would have to believe, to believe what the defense is telling you at this point that that is her motive to lie." *See supra* ¶28. Based on our supreme court's decision in *Bell*, we agree with the State that these remarks were not improper and, as such, did not constitute plain error. *See Bell*, 380 Wis. 2d 616, ¶14 (observing that there can be no plain error "unless the State's trial commentary was improper").

¶41 Bell was accused of sexually assaulting two minor victims. *Id.*, ¶2. At trial, the prosecutor made statements asserting that the jury "had to believe [the victims] were lying before they could find [Bell] not guilty." *Id.*, ¶41. On appeal, our supreme court referred to those statements as "the 'must believe' statements." *Id.* The prosecutor also made statements claiming that "people generally do not lie without reason, and that if the victims had no motive to lie, they should be believed." *Id.* Our supreme court described those statements as "the 'motive' statements." *Id.* Bell argued that the prosecutor's statements impermissibly shifted the burden of proof to him "by framing this case as a binary proposition: The jury must convict him if it believes the victims, and may find him not guilty only if it does not." *Id.*, ¶11.

16

¶42     Our supreme court concluded that neither the prosecutor's "must believe" statements nor the "motive" statements were improper and that, as a result, the statements did not constitute plain error.  Addressing the "must believe" statements, the court explained that "the prosecution and defense theories of the case were mirror-images: The prosecution said [the victims] were telling the truth, the defense said they were not.  But they agreed that the resolution of that contest would decide the case." *Id.*, ¶42.  In particular, the court explained that Bell

> pursued a reasonable, but narrowly focused strategy.  He did not argue that [the victims'] description of events failed to satisfy the statutory elements of the crimes with which he was charged.  He did not argue mistaken identity or assert that someone else bore responsibility for the assaults.  He did not argue the actions had been misconstrued.  He said they never happened.  The only evidence he adduced at trial related to the victims' credibility, and all of his efforts went into showing that [the victims'] could not be believed.

*Id.*, ¶43.

¶43     Under these circumstances, the court concluded that there was no "meaningful distinction … between the defense's assertion that the jury must find Mr. Bell not guilty because the victims lied and the prosecution's argument that the jury may not make such a finding unless they did." *Id.*, ¶¶44, 51.  The court explained that given Bell's trial strategy, the "only way" that Bell "could have won an acquittal" was by "convinc[ing] the jury that the victims lied" because he "offered the jury no weakness in the State's case other than the victims' credibility." *Id.*, ¶47.  Thus, "the jury's resolution of the case had to follow its conclusion regarding the victims' veracity." *Id.*  The court held that, in such circumstances, "when the prosecutor's statements are fairly characterized as

17

impressing on the jury the importance of assessing the witnesses' credibility, there is no error." *Id.*, ¶51.

¶44    The court also concluded that the prosecutor's "motive" statements were not improper because, while the prosecutor "was undoubtedly encouraging the jurors not to disbelieve the victims unless they found evidence of a motive to lie," such argument "is in an entirely different category from an assertion that they cannot disbelieve the victims without such evidence." *Id.*, ¶53.  The court stated that it is "a matter of general life experience that people normally do not lie without reason" and that the prosecutor's statements "about this common-sense principle and … encouragement not to discard it" were not improper. *Id.*, ¶55.

¶45    Turning to the facts of this case, we are not convinced that the prosecutor's challenged remarks during his rebuttal closing argument constituted the type of "must believe" statements at issue in *Bell*.  Again, the prosecutor stated that Alice had no motive to lie, unless the jury believed that Alice wanted to testify in court about her vagina, and "[t]hat's what you would have to believe, to believe what the defense is telling you at this point that that is her motive to lie."  We view this comment as a statement about Alice's lack of a plausible motive to lie, rather than as a statement that the jurors "had to believe [Alice was] lying before they could find [Zastrow] not guilty." *See id.*, ¶41.

¶46    However, even if the prosecutor's comment is viewed as the type of "must believe" statement discussed in *Bell*, we nevertheless conclude that the comment was not improper under *Bell*'s analysis.  As in *Bell*, in this case, the State and Zastrow offered mirror-image theories.  The State argued that Alice's testimony was reliable and established each element of Zastrow's charged offense because Alice had provided a consistent account of the sexual assaults since

18

reporting them in 2018. Conversely, the defense argued that the jury should not believe Alice's testimony due to inconsistencies between her testimony, her forensic interview, and the testimony of other witnesses. Thus, for both parties, the outcome of the case depended on whether the jury found Alice's testimony to be credible. Under these circumstances, even if the prosecutor's challenged comment could fairly be characterized as predicating acquittal on a finding of Alice's dishonesty, the argument would still have been proper under *Bell*. *See id.*, ¶51 (holding that when "the verdict will necessarily follow the jury's determination of the victims' credibility, the State's argument that the jurors should not find [the defendant] not guilty unless they conclude [the victims] lied is equivalent to asking the jurors to carefully weigh the victims' credibility").[7]

¶47 The prosecutor's challenged statement was also not improper if characterized as a "motive" statement under the *Bell* analysis. Like the prosecutor in *Bell*, the prosecutor here invoked the "common-sense principle" that "people normally do not lie without reason" and argued that Alice lacked a plausible motive to lie about Zastrow sexually assaulting her. *See id.*, ¶55. Moreover, the prosecutor's argument in that regard was a direct response to the defense's suggestion that Alice had a motive to lie because she disliked Zastrow and because his relationship with Martha had ended badly.

---

[7] Zastrow argues that this case is distinguishable from *State v. Bell*, 2018 WI 28, 380 Wis. 2d 616, 909 N.W.2d 750, because his trial attorney challenged Alice's credibility by arguing that her memory was faulty, rather than by arguing that she was lying. We agree with the State, however, that *Bell* did not draw such a distinction. Rather, *Bell* identified the dispositive factor as whether the outcome of the case, from both parties' perspectives, turned on the jury's assessment of the victim's credibility. *See Bell*, 380 Wis. 2d 616, ¶¶44-46. We further agree with the State that a defense attorney "cannot evade *Bell* by using a euphemism for dishonesty instead of bluntly calling the victim a liar."

¶48    For these reasons, we reject Zastrow's assertion that the State improperly shifted the burden of proof to him during its rebuttal closing argument. Accordingly, the prosecutor's challenged comment did not constitute plain error.

### B.  Commenting on Zastrow's constitutional right to silence

¶49    Zastrow next claims that the State committed plain error during its closing argument by referring to Alice's sexual assault allegations as "uncontested."  He asserts that, by doing so, the State improperly commented on his invocation of his constitutional right not to testify.

¶50    The United States Supreme Court has held that the Fifth Amendment to the United States Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  *Griffin v. California*, 380 U.S. 609, 615 (1965).  In *State v. Hoyle*, 2023 WI 24, ¶29, 406 Wis. 2d 373, 987 N.W.2d 732, our supreme held that three elements "must be present for a prosecutor to violate *Griffin*."

> First, the prosecutor's language must have been "manifestly intended to be" or was "of such character that the jury would naturally and necessarily take it to be" a "comment on the failure of the [defendant] to testify."  Second, the prosecutor's language must also have been "manifestly intended to be" or was "of such character that the jury would naturally and necessarily take it to be" "adverse," meaning comment "that such silence is evidence of guilt."  Finally, the prosecutor's comments must not have been "a fair response to a claim made by defendant or his counsel."

*Hoyle*, 406 Wis. 2d 373, ¶29 (citations omitted).

¶51    The *Hoyle* court concluded that a prosecutor's comments referring to the victim's testimony as "uncontroverted" did not violate *Griffin*.  *Hoyle*, 406 Wis. 2d 373, ¶2.  The court concluded that the first element of its three-element

test was not satisfied because the comments "were neither 'manifestly intended to be' nor 'of such character that the jury would naturally and necessarily take [them] to be' comments on the defendant's silence." *Id.*, ¶33 (citation omitted). The court emphasized that the main issue at the defendant's trial "was the credibility of the State's witnesses." *Id.*, ¶34. The court also acknowledged that in his closing argument, "the prosecutor anticipated defense counsel would argue reasonable doubt based on a lack of corroborating evidence" for the victim's allegations. *Id.*, ¶35. In that context, the court understood that the prosecutor's description of the victim's testimony as "uncontroverted" was intended "to focus the jury's attention on what evidence it was permitted to consider" and to emphasize that the jurors could not "'speculate' that there was some other evidence not presented that might exonerate [the defendant]. They were to focus solely on whether the State's witnesses were credible." *Id.*, ¶36. The court further stated that even if it were "possible" that the jury could have understood the prosecutor as commenting on the defendant's decision not to testify, "the jury would not have 'necessarily' done so, and we 'should not lightly infer' that the jury would have drawn the 'most damaging meaning' from the prosecutor's statements." *Id.*, ¶38 (citation omitted).

¶52 Like the trial in *Hoyle*, the outcome of Zastrow's trial turned on the jury's assessment of Alice's credibility. Under those circumstances, the prosecutor's reference to Alice's sexual assault allegations being "uncontested" was not manifestly intended to be, or of such character that the jury would naturally and necessarily take it to be, a comment on Zastrow's failure to testify. *See id.*, ¶29. Instead, the prosecutor's challenged comment was part of an argument in which he urged the jury to focus on the consistent aspects of Alice's accounts of the sexual assaults rather than on her inconsistent statements regarding

ancillary details. Under these circumstances, the prosecutor's comment does not satisfy the first element of the *Hoyle* test.[8]

¶53 The prosecutor's comment also fails to satisfy the second element of the *Hoyle* test because it was not manifestly intended to be, or of such character that the jury would naturally and necessarily take it to be, a comment that Zastrow's silence was evidence of his guilt. *See id.* The manifest intent of the prosecutor's comment was to distinguish Alice's consistent and unchallenged statements about the sexual assaults themselves from her other statements that were undermined by evidence introduced at trial. Under these circumstances, the prosecutor's comment did not imply that Alice's sexual assault allegations were uncontested *due to Zastrow's decision not to testify*.[9] Moreover, the circuit court instructed the jury that Zastrow had an "absolute constitutional right not to testify" and that the jury could not consider his decision not to testify when reaching its

---

[8] Zastrow argues that the State forfeited any argument regarding the first and second elements of the test set forth in *State v. Hoyle*, 2023 WI 24, ¶29, 406 Wis. 2d 373, 987 N.W.2d 732, because it "solely argued the third prong of *Hoyle* during postconviction litigation." Zastrow, however, does not provide any record citation in support of that assertion. Regardless, the forfeiture rule "generally applies only to appellants, and we will usually permit a respondent to employ any theory or argument on appeal that will allow us to affirm the [circuit] court's order, even if not raised previously." *Finch v. Southside Lincoln-Mercury, Inc.*, 2004 WI App 110, ¶42, 274 Wis. 2d 719, 685 N.W.2d 154.

[9] Zastrow argues that the prosecutor's comment that Alice's sexual assault allegations were "uncontested" must have been intended as an adverse comment on his failure to testify because Zastrow "was the only individual who could have testified that the sexual assaults did not occur." *Hoyle* rejected this same argument, however, on the grounds that other evidence—besides the defendant's testimony—could have been used to contradict the victim's assertions. *See Hoyle*, 406 Wis. 2d 373, ¶37. Here, as in *Hoyle*, Zastrow's trial attorney identified evidence from sources other than Zastrow that could have contradicted Alice's account, if believed by the jury. For instance, defense counsel noted that the nanny cameras never captured any sexual assaults and that Ben denied seeing anything concerning between Zastrow and Alice. We agree with the State that, under these circumstances, "the jury could not have concluded that only Zastrow could contradict Alice's testimony."

verdict. "We presume that the jury follows the instructions given to it." ***State v. Truax***, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989).

¶54 Finally, as to the third element of the ***Hoyle*** test, the prosecutor's challenged comment was a "fair response" to an argument raised by Zastrow's trial attorney. *See* ***Hoyle***, 406 Wis. 2d 373, ¶29. Specifically, during her closing argument, Zastrow's trial attorney highlighted various inconsistencies between Alice's trial testimony, her forensic interview, and the testimony of other witnesses. Zastrow's attorney used those inconsistencies to argue that the jury should not believe Alice's testimony that Zastrow had sexually assaulted her. The prosecutor's challenged comment, in turn, acknowledged those inconsistencies but argued that Alice's account of the assaults themselves was uncontested and, therefore, reliable. We agree with the State that "it was reasonable for the prosecutor to proactively rebut [Zastrow's] anticipated attacks on [Alice's] credibility" in this fashion.

¶55 Thus, the prosecutor's challenged comment fails to satisfy any of the three elements of the ***Hoyle*** test. Accordingly, we reject Zastrow's argument that the comment was improper and further conclude that it did not constitute plain error.

*C. "Golden rule" arguments*

¶56 Zastrow's final plain error argument pertains to the prosecutor's comments during his opening statement and closing argument about a monster hiding under a sleeping child's bed, as well as the prosecutor's remarks about how difficult it was for Alice to testify in court about the sexual assaults. Zastrow contends that these comments were impermissible "golden rule" arguments.

¶57   "In a criminal case, a golden rule argument asks the jurors to place themselves in the victim's shoes." ***State v. DeLain***, 2004 WI App 79, ¶23, 272 Wis. 2d 356, 679 N.W.2d 562, *aff'd*, 2005 WI 52, 280 Wis. 2d 51, 695 N.W.2d 484.   Such arguments "are not allowed because they appeal to the jurors' sympathy for persons who have been injured or victimized by a crime." ***Id.***

¶58   We conclude that the prosecutor's challenged comments did not constitute impermissible golden rule arguments.  The comments did not invite the jurors to place themselves in Alice's shoes.  Rather, the prosecutor's comments about how difficult it was for Alice to testify in court about the sexual assaults served to bolster Alice's credibility by suggesting that she would not have chosen to do such a difficult thing unless the sexual assault allegations were true.  The prosecutor's comments about a monster underneath a sleeping child's bed, in turn, highlighted the factual circumstances of the sexual assaults, as every assault occurred while Alice was lying in her bed at night.  Further, the prosecutor properly used the metaphor of the monster under the bed to suggest that, based on Alice's testimony, the jury should find Zastrow guilty of monstrous conduct—i.e., repeated sexual assault of a child.

¶59   For these reasons, we reject Zastrow's assertion that the prosecutor's comments were improper golden rule arguments, and we therefore conclude that the comments did not constitute plain error.

## II.  Ineffective assistance of trial counsel

¶60   On appeal, Zastrow also renews his claims that his trial attorney was constitutionally ineffective in various respects.  To prevail on an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the

defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, the defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent assistance." *Id.* at 690. To demonstrate prejudice, the defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other. *Id.* at 697.

¶61 Whether an attorney rendered ineffective assistance is a mixed question of fact and law. *State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* However, whether the defendant's proof is sufficient to establish ineffective assistance is a question of law that we review independently. *Id.*

*A. Failure to investigate Freda as a witness*

¶62 Zastrow argues that his trial attorney was constitutionally ineffective by failing to investigate Freda, Zastrow's nephew, as a potential witness. At the *Machner* hearing, Freda testified that during the summer of 2016, he was living with his father but spent "98 percent of the time" at the apartment where Zastrow lived with Alice and her family. During that time, Freda typically slept in Mark's room, but sometimes he and Mark would argue and then he would sleep in the hallway outside of Mark's room. Freda testified that he is a light sleeper and that various noises in the apartment would routinely wake him—for instance, "[d]oors slamming; people talking; running down hallways."

25

¶63 Freda testified that he and Mark "would stay up as late as possible playing video games all night," typically until "four, five, six in the morning," and they then "slept through most of the day." Zastrow would leave for work at around 4:30 a.m., and Freda could "hear him walking through the house because the walls were thin," even though "the doors were closed." According to Freda, "[m]ost nights" Zastrow would check on Mark and Freda before leaving for work.

¶64 Freda testified that he never observed Zastrow touching Alice inappropriately or Alice running into the bathroom screaming. In addition, he never saw Mark confront Zastrow with a BB gun, and he did not recall Alice accusing Zastrow of inappropriate touching during the summer of 2016.

¶65 Freda testified that he and Mark kept the television volume low while playing video games at night, and they were generally able to hear people coming and going from the apartment's primary bedroom. He also testified, however, that he and Mark were loud while playing video games, and they "tried to keep it down" but "always failed." They were routinely admonished "that everyone was trying to sleep and [they] should keep it down." They kept the door of Mark's bedroom closed in an attempt to minimize their noise. While they were being loud, the "only thing" Freda would be able to hear from outside Mark's room was "doors opening."

¶66 Freda testified that he and Mark would "frequently" leave Mark's room during the night to grab snacks and drinks or use the bathroom. During those trips outside of Mark's room, Freda never saw Zastrow standing over Alice's bed, which he testified would have been "unusual."

¶67 Freda further testified that, prior to Zastrow's trial, he was not interviewed by any law enforcement officer regarding Alice's sexual assault

allegations. In addition, no one from Zastrow's trial attorney's office contacted him before Zastrow's trial. Freda testified that had he been contacted, he would have been willing to speak with a private investigator working for Zastrow's trial attorney.

¶68 Zastrow's mother testified at the *Machner* hearing that she attended multiple meetings between Zastrow and his trial attorney. During those meetings, either she or Zastrow brought up Freda's name as a potential witness and told Zastrow's trial attorney that Freda would be willing to give a statement that he did not observe any sexual assaults. Zastrow's mother provided trial counsel with Freda's phone number and address, and she offered to help trial counsel get in touch with Freda. According to Zastrow's mother, trial counsel said that she would interview Freda, but she never did.

¶69 Zastrow's trial attorney testified that she did not specifically recall being told that Freda was a potential witness. She testified, however, that she would have "no reason not to believe that" Zastrow told her about Freda; she simply had "no recollection" of him doing so. She further testified that she had no strategic reason for not interviewing Freda as part of her investigation. She opined that Freda's testimony would have been "extremely helpful" to Zastrow's defense as "additional testimony of the implausibility of [Alice's] allegations." She further testified that if she had been aware of Freda's potential testimony before trial, she would have subpoenaed him to testify.

¶70 We conclude that, regardless of whether Zastrow's trial attorney performed deficiently by failing to investigate Freda as a potential witness, counsel's failure to do so did not prejudice Zastrow's defense. As the postconviction court aptly noted, while Freda could have testified that he did not

observe Zastrow sexually assaulting Alice, he could not confirm that he was not "otherwise occupied playing video games" when the assaults happened.

¶71     Furthermore, Freda's testimony that he did not observe Zastrow sexually assaulting Alice would have been cumulative of other evidence presented at trial. Ben, who slept in the same room as Alice, specifically denied seeing Zastrow sexually assault her. Mark, who testified that he was typically awake at night playing video games, did not testify to witnessing any sexual assaults. Martha, who sometimes slept on a couch in the living room, also did not testify that she had observed any sexual assaults. We agree with the State that if the jury found Zastrow guilty after hearing this testimony, Freda's similar testimony that he did not observe any sexual assaults "would not have made a difference."

¶72     Zastrow highlights Freda's *Machner* hearing testimony that he never heard Alice run screaming into the bathroom. He therefore contends that Freda's testimony would have contradicted Alice's trial testimony that, following one assault during which Zastrow penetrated her vagina, she "kind of screamed and took off to the bathroom." Notably, however, Alice testified that this incident did not occur until after she turned 13, which would have been during the summer of 2017. Freda testified about living in the apartment during the summer of 2016. Consequently, he would not have been able to confirm or deny anything that happened during the summer of 2017.

¶73     Zastrow also argues that Freda "would have been the sole witness to contradict a core argument made by the State during closing: that there was no evidence Mr. Zastrow checked on the children early in the morning before leaving for work." During its closing argument, the State highlighted Ben's testimony that he once woke up in the middle of the night and saw Zastrow standing over Alice's

bed. The State also emphasized Mark's testimony that he would sometimes see Zastrow awake in the living room at around 2:00 or 3:00 a.m., which Mark found to be "odd." The State argued:

> I know that when I wake up at 2:00 knowing that I leave my house at 6:15, I am angry that I am awake at 2:00 and I go right back to sleep. Everybody has that moment where you wake up and it's "it is—wait—oh, no. No, it's not."

> Nobody gets up and goes over to check on one of the children, because he's not around the other children. They aren't seeing him standing over the other children's beds. He doesn't come check on [Mark]; he doesn't come go where [Ben] is. [Ben] and [Mark] see him over [Alice's] bed. He's there, though they don't know what is happening.

¶74 According to Zastrow, Freda's testimony would have contradicted the State's argument that Zastrow did not routinely check on the children and, therefore, that Zastrow was not simply checking on Alice when Ben and Mark saw him in the living room in the middle of the night. We are not persuaded. At the *Machner* hearing, Freda specifically testified that Zastrow would sometimes check on Freda and Mark before Zastrow left for work in the morning. Freda did not testify that Zastrow ever checked on the other children—including Alice—before leaving for work. Moreover, Freda did not testify that Zastrow ever checked on any of the children in the middle of the night—for instance, at 2:00 or 3:00 a.m. Thus, Freda's testimony would not have countered the State's argument that Zastrow was not simply checking on Alice when Ben and Mark saw him in the living room in the middle of the night.

¶75 For these reasons, we agree with the State and the postconviction court that Zastrow's trial attorney's failure to investigate Freda as a potential

29

witness did not prejudice Zastrow's defense.[10] Accordingly, Zastrow has failed to establish that his trial attorney was constitutionally ineffective in that regard.

*B. Failure to execute the trial strategy in a reasonable manner*

¶76    Zastrow next argues that although his trial attorney "pursued a reasonable theory of defense," she failed to execute her trial strategy in a reasonable manner, for four reasons. We conclude that with respect to each of these claimed errors, Zastrow has failed to demonstrate that his trial attorney performed deficiently.

1. Failure to object to the State's improper remarks

¶77    Zastrow claims that his trial attorney was constitutionally ineffective by failing to object to the prosecutor's allegedly improper remarks during his opening statement and closing argument. We have already concluded, however, that those remarks were not improper. *See supra* ¶¶40-59. As such, any objection to those remarks would have been properly denied. An attorney does not perform deficiently by failing to raise a meritless objection. *See State v. Berggren*, 2009 WI App 82, ¶21, 320 Wis. 2d 209, 769 N.W.2d 110.

---

[10] Notably, while Zastrow's trial attorney testified that Freda's testimony would have been "extremely helpful" to Zastrow's defense and that she would have subpoenaed Freda to testify had she been aware of his potential testimony, we are not bound by an attorney's assessment of whether particular conduct was prejudicial. As noted above, whether the facts satisfy the legal standards for an ineffective assistance of counsel claim is a question of law that we review independently. *See State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325.

## 2. Failure to object to testimony regarding the video cameras

¶78 Zastrow also argues that his trial attorney was ineffective by failing to object to Martha's testimony regarding the video cameras that she installed in the apartment. Specifically, Zastrow argues that his trial attorney should have objected to Martha's testimony that the SD cards from the cameras "disappeared," based on the best evidence rule, WIS. STAT. § 910.02.

¶79 We agree with the State that the best evidence rule is inapplicable here. WISCONSIN STAT. § 910.02 provides, "To prove the content of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in [WIS. STAT.] chs. 901 to 911, [WIS. STAT. §] 137.21, or by other statute." Martha's testimony that the SD cards "disappeared" was not an attempt to prove the content of any recordings taken by the video cameras that she placed in the apartment. Rather, her testimony was that she was not able to view the recordings because someone removed the SD cards on which the recordings were contained. Thus, any objection to Martha's testimony based on the best evidence rule would have been properly denied, and Zastrow's trial attorney did not perform deficiently by failing to raise such an objection. *See **Berggren**, 320 Wis. 2d 209, ¶21.

¶80 Zastrow further argues that his trial attorney should have objected to Martha's testimony regarding the operation of the video cameras and the "cause of a data loss" based upon a lack of foundation. In support of this assertion, Zastrow cites two decisions that he contends "govern the proper foundation for testimony on the operation of similar equipment." One of those decisions held that a speed reading from a radar device is admissible without expert testimony, as long as the operating officer testifies, among other things, that he or she "has adequate

training and experience in [the device's] operation." ***State v. Hanson***, 85 Wis. 2d 233, 244-45, 270 N.W.2d 212 (1978). The other decision held that expert testimony is not required to admit a report from an electronic monitoring device (EMD) used to monitor an individual under supervision by the Department of Corrections (DOC), but that a court "should not afford a presumption of accuracy to a particular report or EMD until the State has put forth evidence regarding the installation of the specific device and testimony as to its accuracy and reliability by a DOC employee familiar with its operation." ***State v. Kandutsch***, 2011 WI 78, ¶¶40, 45, 336 Wis. 2d 478, 799 N.W.2d 865, *superseded by statute on other grounds as stated in* ***State v. Jones***, 2018 WI 44, ¶30, 381 Wis. 2d 284, 911 N.W.2d 97.

¶81　　Both ***Hanson*** and ***Kandutsch*** are materially distinguishable from this case. Unlike ***Hanson*** and ***Kandutsch***, this case does not involve the reliability or accuracy of a report or reading from a particular device. Rather, Martha briefly testified that she installed video cameras in the apartment; that the cameras were plugged into the walls; that someone unplugged the cameras while she was not at home; that the video footage from the cameras was stored on SD cards; and that some of the SD cards "disappeared"—in other words, were removed from the cameras. This type of testimony bears no relation to the testimony at issue in ***Hanson*** and ***Kandutsch***. As such, any argument that the same type of foundation required by ***Hanson*** and ***Kandutsch*** was also required for Martha's testimony would have failed. Accordingly, Zastrow's trial attorney did not perform deficiently by failing to raise that argument. *See* ***Berggren***, 320 Wis. 2d 209, ¶21.

### 3. Failure to effectively cross-examine Alice

¶82     Next, Zastrow argues that his trial attorney was constitutionally ineffective by failing to effectively cross-examine Alice.  He notes that his attorney's strategy at trial "was to highlight the various inconsistent and implausible remarks that Alice made throughout the investigation."  He argues, however, that counsel failed to confront Alice with these inconsistencies and implausible statements on cross-examination.  He contends that counsel's failure to do so was unreasonable, in light of counsel's chosen trial strategy.

¶83     During the *Machner* hearing, Zastrow's trial attorney testified that her strategy at trial was to attack Alice's testimony regarding the sexual assaults as implausible.  To that end, counsel elicited evidence showing inconsistencies between Alice's trial testimony, her forensic interview, and other witness's testimony.  However, counsel made a strategic decision to bring out those inconsistencies during the cross-examination of other witnesses, rather than Alice's cross-examination.  Counsel explained that "going after a child in front of a jury doesn't make you look very sympathetic, and by [attacking the child's credibility] through other witnesses[,] you're not having to outright call the child a liar."

¶84     The postconviction court found that Zastrow's trial attorney made a reasonable strategic decision not to cross-examine Alice regarding her inconsistent and implausible statements and, instead, to highlight those inconsistencies during the testimony of other witnesses.  "[W]here a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'"  *State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93 (citation omitted).  We agree with the

33

postconviction court that trial counsel's strategic decision not to cross-examine Alice regarding her inconsistent and implausible statements was reasonable, under the circumstances. Zastrow has therefore failed to show that his trial attorney performed deficiently in that respect.

### 4. Failure to object to Martha's testimony regarding Alice's behavioral changes and suicide attempt

¶85 Finally, Zastrow argues that his trial attorney was ineffective by failing to object to Martha's testimony regarding Alice's behavioral changes and suicide attempt following the sexual assaults. He argues that this testimony "should have been excluded as irrelevant, prejudicial, and as an inadmissible character trait." We agree with the State that the testimony at issue was not inadmissible on any of these grounds, and, accordingly, Zastrow's trial attorney did not perform deficiently by failing to object. *See **Berggren***, 320 Wis. 2d 209, ¶21.

¶86 First, Martha's testimony regarding Alice's behavioral changes and suicide attempt was relevant because it went to Alice's credibility. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. "A witness's credibility is always 'consequential' within the meaning of … § 904.01." ***State v. Hurley***, 2015 WI 35, ¶81, 361 Wis. 2d 529, 861 N.W.2d 174 (citation omitted). Here, Martha's testimony supported Alice's credibility by showing that Alice's mood and behavior noticeably changed in 2016, when Alice alleged that the sexual assaults began. Martha's testimony also corroborated Alice's statements during her forensic interview about changes in her mood and behavior following

the assaults. Consequently, any relevancy objection to this testimony would have been properly overruled.

¶87 Second, the probative value of Martha's testimony was not substantially outweighed by the danger of unfair prejudice under WIS. STAT. § 904.03. The evidence was offered to bolster the credibility of Alice's testimony that Zastrow had sexually assaulted her, which was the central issue at trial, and the evidence's probative value was therefore high. Although the evidence was undoubtedly prejudicial to Zastrow, he has not shown that its probative value was *substantially* outweighed by the danger of *unfair* prejudice. The testimony about Alice's behavioral changes, generally, was not so inflammatory as to "appeal[] to the jury's sympathies, arouse[] its sense of horror, provoke[] its instinct to punish or otherwise cause[] [the] jury to base its decision on something other than the established propositions in the case." *See State v. Sullivan*, 216 Wis. 2d 768, 790, 576 N.W.2d 30 (1998). Furthermore, Martha's testimony about Alice's suicide attempt amounted to a single sentence, and the State did not elicit any additional details about the suicide attempt or refer to that topic during its closing argument. Under these circumstances, any objection to this testimony under § 904.03 would have been properly overruled.

¶88 Third, Martha's testimony regarding Alice's behavioral changes and suicide attempt was not "character evidence" under WIS. STAT. § 904.04(1). That subsection provides that, subject to certain exceptions, "[e]vidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion." *Id.* Here, evidence that Alice experienced behavioral changes following the alleged assaults was introduced to bolster Alice's credibility. It was not introduced to show that Alice acted in conformity with a particular character trait

on a particular occasion. Nor was it introduced to show that Zastrow acted in conformity with a particular character trait when he sexually assaulted Alice. As such, any objection to Martha's testimony under § 904.04(1) would have been properly denied.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.